WALTER REED v. STATE.

No. A-99. Opinion Filed September 7, 1909.

(103 Pac. 1042.)

1. INDICTMENT AND INFORMATION—Necessity of Indictment —Offenses Before Statehood. Article 5, amendments to the Constitution of the United States, provides that: "No person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury." Held, that this provision of the federal Constitution applies to all offenses committed prior to statehood, and a person charged with murder committed in Oklahoma Territory, prior to statehood, can only be prosecuted for the offense, through the intervention of a grand jury by indictment.

2. SAME—Requisite Number of Grand Jurors—Concurrence—Presumption. Section 18, art. 2, Const. Okla., provides that: "A grand jury shall be composed of twelve men." The act of criminal procedure of the territory of Oklahoma provided that "an indictment cannot be found without the concurrence of at

least twelve grand jurors," and that the procedure, practice, and pleadings in criminal actions not specifically provided for in the Code of Criminal Procedure shall be in accordance with the procedure, practice, and pleadings of the common law. Under the common law a grand jury consisted of not less than 12 nor more than 23 jurors. In support of a motion to set aside the indictment, it was agreed that the grand jury which returned the indictment consisted of 12 jurors. Held, that where an indictment has been returned, and no proof is offered to show that said indictment was not found by the unanimous concurrence of the grand jurors, there is nothing to show that the defendant has been denied a substantial right to which he was entitled under the law in force when the offense was committed.

3.    **PROSECUTING ATTORNEYS—Procedure—Private Counsel for State.** On the trial of a person charged with the crime of murder, the defendant objected to private counsel participating in the prosecution. **Held,** the laws of this state only prohibit persons other than the county attorney or his deputy from performing such acts in the prosecution of crimes as are strictly official, such as appearing before and advising the grand jury, verifying and filing informations, approving complaints, etc.

The assistance of private counsel in the trial of criminal cases is not prohibited.

4.    **HOMICIDE—Self-Defense—Instructions.** The defendant requested the court to instruct the jury that: "You are instructed that if you believe, from the evidence, that, from knowledge or information believed by defendant, it, at the time of the homicide, appeared to the defendant that the deceased had within his residence deadly weapons, and that the feelings of the deceased toward the defendant were of such a hostile character that he desired to kill him or do him some great bodily injury, and that he had previously made threats that he would do so, of which threats. the defendant then and there had information, and that to the defendant it then appeared that the deceased was running toward his residence for the purpose of arming himself with such weapons, and therewith and from behind cover of the house shooting the defendant, and that, acting solely with the view of protecting himself from such apparent injury and attack, and believing that the same was necessary to protect himself from such injury, the defendant shot and killed the deceased, such act would be justifiable homicide, and you should acquit the defendant." **Held,** under the conceded facts, the court properly refused this instruction, as it fails to put the proposition to the jury that to justify a homicide in self-defense the threatened assault must be of such character as would induce in the mind of a reasonable man a fear of death or great bodily harm, and wholly fails to consider that, where the defendant is in a place where he has no right to be, the right of self-

defense can only arise when no other means to avoid the threatened danger are apparent, and that it was the duty of the defendant to retreat.

5. **SAME—Self-Defense—Danger to Accused—Caused by Accused.** While the necessity of taking human life need not be one arising out of real, actual, or imminent danger, in order to justify the slayer, as he may act upon the belief arising from appearances, which gives him reasonable cause to apprehend danger of death or of great bodily harm, although there may be no actual danger, and his guilt must depend upon the circumstances as they appear to him, but the danger must not be brought on by the wrongful conduct or unlawful acts of the slayer.

6. **SAME.** A defendant cannot avail himself of the plea of justifiable homicide in self-defense, if the necessity for that defense was brought about by his own deliberate and lawless acts, as by arming himself with a 45-caliber repeating rifle, charged with 12 loads, and going with his sons to the home of the deceased for the purpose of forcibly taking possession of live stock held under a claim of lawful right, and shooting the deceased on sight in his dooryard.

7. **SAME—Self-Defense—Armed Trespasser—Armed Householder.** Where the deceased ran from his barn to his house, the mere apprehension or belief that he was about to arm himself and return to attack the defendant, an armed trespasser upon his premises, does not show a present and imminent danger. If the deceased intended to arm himself, he was only doing what he had a lawful right to do in protecting his home and his person from an unlawful assault.

8. **SAME—Justification—Evidence—Instructions.** The plea of justification protects only those who are without fault. Under these facts it was proper for the court to instruct the jury that under the evidence in the case there was no element of excusable or justifiable homicide. Such an instruction was a declaration of the law, and not an invasion of the province of the jury to determine the facts. The law of justifiable homicide in self-defense was not relevant to any hypothesis arising out of the evidence in the case.

9. **SAME—Justification—Unfounded Fear.** No person has a right to kill another through unfounded fear or cowardice.

10. **SAME—Evidence—Threats.** Where it is clearly and unequivocally shown that the defendant was the aggressor, and there is no pretense that the deceased was about to carry the threats into execution, or that the defendant had reasonable grounds to believe, and did believe, that such was the case, evidence of such threats by the deceased, although they were communicated to the defendant, is inadmissible.

11.   APPEAL—Remarks of Counsel—Prejudice.  Remarks of counsel
      in the course of their arguments, objected to as improper, shall
      be considered and construed in reference to the evidence, and,
      in order to constitute reversible error, the impropriety indulged
      in must have influenced the verdict.

12.   APPEAL—Fair Trial—Statutes—Prejudice.  Section  5618, Wil-
      son's Rev. & Ann. St. 1903, requires this court to:  "Give judg-
      ment without regard to technical errors or defects, or to excep-
      tions which do not affect the substantial rights of the accused."
      The letter and spirit of this law is that if the defendant has had
      a fair trial, and if this court is satisfied that the conviction is
      sufficiently supported by competent evidence, and the verdict
      against the defendant was not reached by error or as the result ·
      of passion and prejudice, the conviction should be affirmed.

(Syllabus by the Court.)

*Error from District Court, Kiowa County; James R. Tolbert, Judge.*

Walter Reed was convicted of manslaughter, and he brings error.  Affirmed.

Walter Reed, hereinafter designated "defendant," was indicted in the district court of Kiowa county, at the January, 1908, term.

The indictment charged that on the 18th day of September, 1907, the defendant did with malice aforethought kill and murder one Elmer Emmons, by shooting him with a Winchester rifle. The defendant was duly arraigned and filed his motion to set aside the indictment and his verified application for an order to take testimony in support of said motion.  It was thereupon agreed by the state in open court:

"That only 12 men were impaneled on the grand jury, and only 12 men considered and found this indictment, and presented it in court, and that said grand jury is composed of only 12 men, and the same is the regular and only grand jury for this term of court."

Upon this agreed statement of facts, said motion was submitted and was by the court overruled, and exception allowed. Thereupon the defendant entered a plea of "not guilty." May 20th the state served on defendant a list of names and post office addresses of witnesses on the part of the state. May 25th

the state moved the court for leave to indorse upon the indictment the names of additional witnesses for the state. Defendant objected, leave granted, and exception allowed. Both parties announced ready, and a jury is sworn to try the cause. May 29, 1908, the jury in the case returned their verdict, finding the defendant guilty of manslaughter in the first degree. The defendant filed his motion for a new trial, which motion was by the court overruled and exception allowed. The defendant then filed his motion in arrest of judgment, which motion was by the court overruled and exception allowed. May 29, 1908, the court sentenced the defendant to imprisonment in the state penitentiary for a term of 10 years, at hard labor. The defendant perfected this appeal to the Criminal Court of Appeals by filing therein his petition in error and case-made on February 22, 1909.

Said cause was submitted at the July, 1909, term. The paramount proposition, justifiable homicide in self-defense, as raised on the merits of the case and on the instructions refused and the charge given, requires a comprehensive statement of the evidence.

The deceased, Elmer Emmons, with his wife and three children, resided on his homestead, near Stokes, Kiowa county. The defendant with his family lived on an adjoining farm; his house being about one-half a mile south of the Emmons place. W. B. Johnson, Emmons' brother-in-law, owned 80 acres near by and had leased this land, and turned his stock upon it, and Johnson, asserting that the lease had terminated, had started to plow on it for wheat, and, together with Emmons, distrained the live stock of defendant. Defendant went to Hobart and made complaint, charging that Johnson and Emmons had unlawfully and maliciously destroyed the fence and drove off his stock, which complaint was filed in the probate court of Kiowa county on the 16th day of September, 1907. On the 18th day of September, at Hobart, the defendant bought a 45-70 Winchester repeating rifle, commonly called a "Buffalo gun," and some cartridges, and had the gun

2 Cr.—38

cleaned and oiled, telling the man he bought the gun from, to go and tell the county attorney that he now had a gun to protect his stock and property. He drove from Hobart to his home on that day and on the way fired the gun several times. He drove by the home of the deceased, and at the land in dispute met and talked with the justice of the peace, who had been called in to assess the damages made by the live stock that had been taken up. He then passed on to his home. The house of the deceased was about 12 by 16 with a shed kitchen. About 200 yards south was the stable, boarded on three sides and open on the south. About 4 o'clock, on the said day, the father and mother of Mrs. Emmons arrived on a visit from Kansas. After they had been there a little while, the deceased and his father-in-law walked from the house to the barn and sat down on the east side of the barn. They were there but a short time when the defendant and two sons, one 27 years of age and the other 17, appeared coming from the east, through the corn field. The deceased jumped up and started to run towards his house. The defendant shot at him four times; the third or fourth shot striking him in the back of the head passing through his brain, and coming out below the left eye, killing him instantly. The live stock were in a pasture south of the barn. Defendant told his boys to get the cattle, and they drove the live stock to the 80 acres in dispute. There were six loads in the gun when defendant turned it over to the sheriff. The deceased had no weapon of any kind on his person, and the only persons on his premises at the time were his wife and children and his wife's aged parents.

The testimony of J. S. Johnson was: That his home was in Kansas, his age 68 years; that he and his wife had come for a visit to their daughter, Mrs. Emmons, arriving there about 4 o'clock, September 18th, and Emmons took him out to show him the place, and they walked to the well and then to the barn, which is about 200 yards from the house, and were sitting there talking when Emmons jumped up and started running towards the house; that a shot was fired from the corn field; that he looked and

saw three men standing in the corn field five or six feet apart, one of them shooting at Emmons; that he begged him to stop firing; that the third shot struck Emmons as he was running, and he pitched forward on his face dead, about half-way from the barn to the house; that the defendant did the shooting, and when Emmons fell he said, "Now boys go and get the cattle." ·

The defendant, testifying on his own behalf, stated: That he was a married man and would be 50 years old his next birthday, and had lived in Kiowa county since January, 1902; that he had known Elmer Emmons since 1902; that his house around the road was three-quarters of a mile from Emmons' house and not quite a half a mile straight across; that he knew W. B. Johnson and leased 80 acres of land from him in March, 1906, for two years and was to have all crops raised on it for breaking it out; that in the year 1907 he raised about 55 acres of broom corn on this land, and on September 15, 1907, he had about 10 acres of broom corn ungathered; that shortly before this he had turned in 6 mules and 2 horses and 10 or 12 head of cattle to pasture on said land; that Johnson and Emmons turned the mules and horses out on the highway; that he went to where they were.

The record then reads as follows:

"Q. What did they say to you at that time? A. They were sitting down, I think, beside of their horses, and I said, 'Johnson, did you drive them mules out?' and he said, 'Yes,' and I says to Emmons, 'Did you help drive them mules out?' and he did not answer for a little bit, and he said, 'Yes, by God, I did,' and with that he started toward me with a hatchet in his hand and wanted to know if there was anything else I wanted.   *   *   *   He would give it to me. I told him that was all I wanted to know.

"Q. Did you advance toward him? A. No, sir; turned right straight around and went to my house.

"Q. Did you succeed in getting the mules in your custody at that time? A. No, sir; we were driving the mules up there.   *   *   *   We had torn down about 10 rods of the fence, and as they seen them coming they turned them into the field. Some of the mules outrun them. I don't think all of them got back in the field, but I know part of them did. ·

"Q. And what became of them? A. The next thing I seen of them was in Emmons' pasture, or corral, whatever you call it. It was a small dry pasture.

"Q. When was that in reference to the time you have spoken of? What day was it when * * * how long was it afterwards before you seen the mules in Emmons' pasture, A. I went back to the house and eat breakfast and hitched up and started to Mt. View, and when I drove past there, the mules were in there. * * * I think that was—

"Q. You went to Mt. View for what purpose? A. To take the train to Hobart.

"Q. What were you going to Hobart for? A. To have them arrested.

"Q. Who arrested? A. Emmons and Johnson.

"Q. Is that the occasion you signed that complaint? (Counsel hands witness Exhibit 4.) A. I think that is my signature.

"Q. Did you make any complaint at that time against Johnson and Emmons? A. Yes, sir.

"Q. Who prepared that complaint, Mr. Reed, if you know? A. Fred Gillett.

"Q. What official position did he hold at that time? A. Deputy prosecuting attorney, I think.

"Q. But before what officer was it filed or sworn to? A. It was prepared at—that is, Connor told him to prepare it—at the suggestion of Connor.

"Q. Was it filed in the probate court? A. Yes, sir; filed in the probate court.

"Q. What did you do after having made that complaint, Mr. Reed? A. I went back home.

"Q. What time did you arrive home? A. Probably about 10 o'clock at night.

"Q. That following night? A: Yes, sir.

"Q. Did you see Emmons that day following? A. Yes, sir.

"Q. What did you do the following day? What occupation did you start in to follow? A. We pulled broom corn until noon.

"Q. Now, before pulling the broom corn, did any difficulty occur between Emmons and yourself with reference to your stock? A. The boys, two little boys, or one of them, I think, might have been two of them, driving the cattle down to the field that morning before we got to the broom corn field—we looked down to the road and seen him coming back with the cattle, and we were get-

ting ready with the team and drove down and met him about half-way down the section line running east and west. I asked what was the matter, and he said the fence was all put up and the gate chained up.

"Q. What did you do? A. I took the cold chisel, hammer, and ax, and I drove up close to the gate, and I cut the chain in two twice with a cold chisel, and swung the gate back and told Bert to drive through and get the mules.

"Q. What other persons had gone there with you? A. Myself, son Lee, Bert, Annie, and Nick.

"Q. Was your wife there? A. No, sir; not at that time.

"Q. Who else, if any one, was at the vicinity of the gate at the time you cut the chain and when you got there? A. W. B. Johnson, Elmer Emmons, Mrs. Emmons, and Frank Johnson.

"Q. Was that when you got there to cut the gate? A. Not at the time, but they got there in a little bit.

"Q. What was said by you to Emmons? A. Never changed a word.

"Q. Did Emmons and Johnson say anything to you? A. They cussed, and Emmons said, 'Damn him, if that was my gate he would not cut it.'

"Q. You had cut the chain and told the boys to drive out the cattle? A. He had driven the team first.

"Q. What did you say? A. Nothing whatever in regard to them.

"Q. What did you do about putting the team inside? A. As soon as they drove the team in, I was stepping out a little to edge the cattle in the gate.

"Q. Was the gate opening out from the highway? A. Yes, sir.

"Q. Well, what happened? A. I was standing facing south, west a little bit, in order to get the cattle around in the gate, and I heard a noise like a slapping a horse with your legs * * * on it, and I turned, and Emmons was almost on me with a horse, and as I turned Emmons struck at me with a hatchet.

"Q. Did you avoid the blow? A. Yes, sir.

"Q. If you had stood still would the horse have run over you? A. He possibly would have struck me.

"Q. If you had remained standing, would the blow have struck you? A. Yes, sir.

"Q. Well, what followed then? A At that they were both

on their horses, and he struck at me and run in behind the cattle.

"Q. Where was Johnson? A. Johnson stayed east of me.
* * * Mrs. Emmons was facing between me and the cattle like, at the time. * * * Frank Johnson was in front of me, and there was just Lee and Nick on the ground, and they had tried to keep them from taking the cattle; but I did not leave the gate.

"Q. You say they took them? You mean Elmer Emmons, W. B. Johnson, Frank, and Mrs. Emmons took the cattle? A. Yes, sir.

"Q. What did they do with them? A. Put them in the pasture I spoke of.

"Q. What did you do? A. Pulled broom corn.

"Q. On the leased premises? A. Yes, sir.

"Q. How long? A. Until noontime.

"Q. How—they took the cattle in the pasture—did Emmons or Johnson, or either of them, come back to the Johnson land where you were pulling broom corn? A. Yes, sir.

"Q. What did they do? A. They cut a lot of broom corn stalks, and they put them over in the pasture with the cattle.

"Q. A big load? A. I do not remember how big a load.

"Q. Did they state anything to you? A. Just simply hollering and cursing and the like of that. I was probably 200 or 300 yards or further from them.

"Q. Did you make any response to them? Did either of your boys say a word to them? A. No, sir.

"Q. After pulling broom corn until noon, what did you do? A. Went to the election, I and my son Lee.

"Q. Did you get dinner first? A. Yes, sir.

"Q. Where did you go to the election? A. What is called the Stokes schoolhouse.

"What after that? A. Went home.

"Q. And then where did you go? A. Fed the team, I think, and started for Hobart again.

"Q. Who? A. I and son Lee.

"Q. When did you arrive in Hobart? A. As near as I can tell, it would be somewhere near 10 or 11 o'clock at night.

"Q. Where did you go at that time? A. I think as soon as I got the team put away I came to the courthouse.

"Q. Did you see anybody at the courthouse? A. There was lots of people here.

"Q. Who did you come to see? A. I do not know that I came to see any one.

"Q. What was your business in Hobart? You did not see any officer that night? A. Yes, sir.

"Q. Who? ° A. I seen Connor in his office.

"Q. Did you have any conversation with him at that time? A. No, sir.

"Q. You did not take any steps towards swearing out a warrant that night? A. I later seen Gillett.

"Q. Have any conversation with him? A. Yes, sir.

"Q. Did you make any arrangements with him about swearing out a warrant? A. I had a conversation in regard to the election, quite a little bit. I did not tell him about this other affair until people were starting to leave, and we started to go home for the night, and we walked with Gillett—I think it was the northeast corner of the square, if I am right—and, during the time we were walking along, I probably took up this question with Gillett as soon as we started from the courthouse, and I related this story, and he said, 'We will take those people up for stealing these cattle, and, of course, Tom will have to act when he is here, and he is here.'

"Q. Did you see Connor? A. I seen him next morning.

"Q. What time next morning? A. I think about 8 o'clock— might have been some after.

"Q. Have any conversation with him? A. Yes, sir.

"Q. What, if anything, was said to you by Connor about this complaint? A. Connor, when I first seen him, was standing outside the door. I am not certain which door. I spoke to him and said I wanted to see him, and he said he was busy now. He talked a little bit to the parties he was with, and I waited until he got through, and I probably spoke to him again, and he came inside the door, and I told him I wanted to see him, and he says, 'I am not going up to the office,' * * * and I think I stood up on one of the steps, and Connor stepped up by me, and I related this story to him and about him trying to kill me, and I said, 'I want another warrant,' and he said, 'I cannot be arresting those people every 15 minutes.' I says, 'Connor, I am a resident of Kiowa county, and you are an officer of the law.'

"Q. What else did you say to Connor? A.. I says, 'I demand protection of my life and property.'

"Q. What did Connor say to you? A. He said, 'Go and protect your own life and property.'

"Q. What did you say to him? A. I said, I did not have a right to do that.

"Q. He says you— A. I says, 'At all hazards?' 'Why certainly,' he says.

"Q. What did you understand that he meant for you to do?

"By Counsel for the Plaintiff: We object. * * * By the Court: Sustained. By Counsel for the Defendant: We except.

"Q. What did you do, Mr. Reed? A. I went straight across from the courthouse, and I went into that large hardware store over there—I don't know who owns it—on the west side of the square. I asked if he had any rifles. He said he did. He showed me what is called them Savage guns, a very powerful gun, and I said I did not want such a gun as that, but I wanted a cheap gun, and then he showed me some other rifles. I think it was $22 he wanted for this Savage gun.

"Q. Did you finally buy a gun? A. Then he showed me one that was a 22, I think, the price was about $12 or $15, I think, and I said, 'Just set it aside. If I do not find one cheaper, I will probably buy that.' We walked out and went to the feedyard, and there was a little secondhand store. I stopped there and asked if he had any rifles, and he said he did not, so we drove on down to Huff's secondhand store, I think it is. I asked if he had any secondhand rifles, and he said he did, and he got out a Winchester—probably that is the one. I asked how much he wanted for it, and he said $10. I tried to buy it for less, and he would not sell it for less, and I bought it.

"Q. You saw the witness Hodgen; who testified in this case? A. Yes, sir.

"Q. Is that the gentleman you bought it of? A. Yes, sir; that is the gentleman.

"Q. Did you say anything to him about taking any word to Connor? A. I told * * * he took a look at the gun, said it was rusty and thought he would oil it, and he did, and when I took it I told him to tell Connor, 'I have a gun to protect my stock and property,' one or the other.

"Q. Did you go home? A. Yes, sir.

"Q. On the road home did you try the gun to see whether

it would shoot or not? A. I shot twice about two miles and a half before I got home.

"Q. In going home did you go near to the Elmer Emmons' premises? A. We went right in front of his house.

"Q. Was that on your direct road home? A. Yes, sir.

"Q. Was that the nearest road? A. The road I always travel in going to Hobart.

"Q. Did you see any person there or have any conversation as you were passing? A. No, sir.

"Q. Near there? A. Yes, sir.

"Q. Who was it? A. Ed. Doss.

"Q. Who is Ed. Doss? A. He is the justice of the peace.

"Q. In that neighborhood? A. He is on the north side of the township line.

"Q. What was the subject of your conversation with Doss? A. When we drove up he was standing right by the gate.

"Q. What gate was that? A. My gate going into the broom corn field?

"Q. Did he say anything to you? A. Yes, sir; he came out, and he says, 'I am here to assess the damages in this field,' and I says, 'Assess damages in my own field?' and he says, 'Yes, sir.'

"Q. You understood he was there a justice of the peace, to assess damages that your stock had done? A. Yes, sir.

"Q. And after talking with him, did you go home? A. Yes, sir.

"Q. Where did you go to? A. Went home.

"Q. And going home you passed by the residence of Emmons? A. Yes, sir.

"Q. Did you see any persons there? A. Yes, sir.

"Q. Who did you see? A. I seen Emmons, Bill Johnson, and a Mr. Robinette, I think.

"Q. What were they doing and where were they? A. They were around the yard there and about the house.

"Q. Did you see any other persons there at the time? A. Some one else came there a little bit before we started home.

"Q. Where were you? A. Right in front of the gate.

"Q. About what time did you arrive at home? A. I would think about 6 o'clock, as near as I could tell—our clock was not running.

"Q. What did you do after arriving home? A. I went in the

house, took a chair, and went out on the north side of the house in the shade.

"Q. From that position, Mr. Reed, could you see the Emmons' house? A. Yes, sir.

"Q. Did you watch the premises there? A. Yes, sir.

"Q. Did you see any persons leave there? A. I seen Robinette, which supposed it was at that time, going west.

"Q. How was he going? A. Afoot, I think. I am not positive about that, and I seen two men, one that I know was Doss, by the spotted pony, going east.

"Q. Doss was riding a spotted pony? A. Yes, sir; and the other man riding with him on what I taken was a bay horse, east.

"Q. Any thing else? A. I seen a spring wagon which I supposed was Johnson and his wife and—

"Q. After these persons had left there, had you seen any persons at Emmons' premises? A. No, sir; I never * * * any one at all.

"Q. Did you at that time determine to go anywhere? Or do anything? A. Yes, sir; I was going down to take charge of that field.

"Q. What field? A. The broom corn field.

"Q. Did you do anything in that connection? A. The boys went along with me to turn the cattle out in the field.

"Q. Did you believe at that time there was any person at Emmons' house? A. No other than Mrs. Emmons.

"Q. If you had known Emmons was there, would you have taken possession of the cattle? A. No, sir.

"Q. You say you were going to take possession of the broom corn field? A. Yes, sir.

"Q. What did you intend to do there at that time? What was your intention when you started out from home? A. I was going across to the broom corn field and to the Emmons' pasture to drive the cattle across the road and stay there.

"Q What were you going to stay there? A. Yes, sir.

"Q. Did you believe that the stock would be removed if you left them where they were? A. Yes, sir.

"Q. What did you do in pursuance to that plan? What did you do in carrying out that plan? Go on in your own way and state what did you do? Did you leave home? A. Yes, sir.

"Q. Who went with you? A. Lee, Bert, Nick, Harvey.

"Q. In what direction did you travel? A. We went direct as near as anybody could go for the field.

"Q. Why did you go that way? A. It was the nearest way to go.

"Q. Did you take that gun with you? A. Yes, sir.

"Q. For what purpose did you take it? A. For protecting my own life and stock.

"Q. After they were in the broom corn field? A. Yes, sir.

"Q. Did you see any one upon your arrival? Traveling through the field would that take you through Emmons' land? A. Yes, sir, part way, most through my own.

"Q. In going through there, did you pursue the most direct and feasible track through the fields? A. Yes, sir.

"Q. Upon arriving near the barn, upon Emmons' premises, did you see any one? A. Yes, sir.

"Q. Whom did you see? A. The first person I seen was Emmons.

"Q. Where was he? A When I first seen him, he was about due west or a little bit south of west of me.

"Q. What was he doing? A. He was running.

"Q. In what direction? A. Running north.

"Q. In reference to the house? A. Direct on the road that leads to the house.

"Q. Did you see any other person at that time? A. No, sir.

"Q. Did you say anything to Emmons at that time? A. The first indication I had of anybody being there at all, I heard one of the boys say that 'There is Emmons.' Which one it is, I cannot exactly say. I thought it was Bert, and I was looking straight ahead, and I did not see anybody, and I heard him say, 'There is Emmons,' and I did not see him and then I turned in that direction and I finally saw him.

"Q. What was that direction? A. A little south of west.

"Q. Then, you were looking somewhat to your rear? A. Yes, sir; and looking west.

"Q. Did you expect to see Emmons there before that time? A. Yes, sir.

"Q. What did you say to him? A. He was watching me, as he seen—as I seen him, he started. Just the instant my eye caught him he started.

"Q. What did you say then? A. I said, 'Stop right there now."

"Q. Did he say anything to you?  A. No, sir.

"Q. What did he do?.  A. Started to run again.

"Q. What did you say to him?  A. I said, 'Stop! Stop! Stop!'

"Q. Did he stop?  A. No, sir; not then.

"Q. What did you do?  A. I shot.

"Q. At him?  A. No, sir.

"Q. What did you intend to do by shooting at that time? A. I intended to scare him and make him believe I would shoot if he did not stop.

"Q. Did he stop?  A. Not then.

"Q. Did you say anything more?  A. I kept hollering, 'Stop! Stop!'

"Q. Did he stop?  A. Yes, sir; when I fired the third shot he did.

"Q. Stop still?  A. Yes, sir.

"Q. Did he stop?  A. Yes, sir; not standing.

"Q. What did you say?  A. I said, 'Now, you stand right there.'

"Q. Did he start again?  A. Yes, sir.

"Q. Did you shoot?  A. Yes, sir.

"Q. What caused you to shoot at that time?  A. I thought my life was in great danger.

"Q. In what way?  A. I knew he had plenty of guns and from what he had done and what I had been told.

"Q. Did you—what did you believe he was going to get possession?  What did you think he was going to get possession of those guns?  A. I thought he was running for the gun or guns.

"Q. Where did you think his guns were?  A. I did not know, possibly in the house.

"Q. What did you believe he would do if he got to the house?.  A. He would kill me and probably the boys.

"Q. What would be his situation as to getting to the house as to being under cover?

"By Counsel for the Plaintiff:  We object to the question for the reason that it is incompetent, irrelevant, and immaterial. By the Court:  Sustained.

"Q.  You may state as to whether or not the position in which you were placed, would that be dangerous where you were? A. Yes, sir.

"By Counsel for the Plaintiff:  We object.  *  *  *  By the Court:  He has already answered.  Proceed.

"Q. How many times did you shoot there? A. I think four times.

"Q. Did you see Emmons fall? A. Yes, sir.

"Q. Did you fire any shots after Emmons fell to the ground? A. No, sir.

"Q. How many shells did you have at that time in your Winchester unfired? A. I never counted them as I put them in, I could not tell.

"Q. About how many? A. Probably five or six. I do not know how many was in it. I did not count them.

"Q. When did you go from there? A. I stood right there as near as I can tell for a period of five minutes.

"Q. Right where you had fired from? A. Yes, sir.

"Q. What were you doing? A. Nothing, only standing there.

"Q. Did you see Mrs. Emmons there? A. I seen her after I had shot the last time.

"Q. Where was she at that time? A. Came out of the south door.

"Q. In what direction did she go? A. She looked out towards the barn and then went west. She went out to where he fell.

"Q. Did you see Johnson, the father-in-law of Emmons? A. I did after I had quit shooting.

"Q. Had you seen him prior to the time the last shot was fired? A. No, sir.

"Q. Where did you go then? A. I thought I would make a circle around the house and go east and still stay in the field, and I probably walked 30 or 40 yards in kind of a circle, and then I made up my mind to go back home, and I went back to my own house.

"Q. Did you go back across the field the same way you had come? A. In walking east that threw me off the track we came on, and I was probably that same distance east of the track going back.

"Q. Did you see the boys after the shooting? A. Yes, sir; they were driving the cattle and mules.

"Q. Where did you go? A. Took them across in the broom corn field and then come home.

"Q. What did you do when you got home? A. They had supper ready when I got home, and I had no dinner yet.

"Q. Did you eat supper? A. Yes, sir.

"Q. What did you do?  A. Lee came to the house, and I told him to get up a team and we would go back to Hobart.

"Q. What were you going to Hobart for?  A. To turn myself over to the sheriff."

He further testified that he knew Emmons had guns in his house, and that Emmons had shot in his direction with a rifle about 10 days before, and that he had been informed that Emmons had threatened to shoot him; that he went to Sunday school every Sunday until Emmons insulted him by taking his hat and putting it in the contribution box.

Lee Reed testified: That he was the son of defendant, 27 years old. That on the 17th day of September he went with the defendant to Hobart. That they arrived home the next day about 4 o'clock, and that his father watched Emmons' place for about an hour, and said: "Those fellows have gone. Let us go down and get the cattle." That he took the gun along to protect himself and keep the cattle in the field. That he told his father that Emmons had six-shooters, shotguns, and a Winchester. That Emmons had said to him one time that he would go to his house and get his six-shooter and shoot hell out of all of us. That he told the defendant that he heard J. E. Evans tell defendant on the Sunday preceding the homicide, at his father's home that that fellow down there would shoot him if he did not watch out, meaning Emmons. That he was at Emmons' place the Friday night before the homicide attending a dance, and that Evans called him aside and told him that he had better go home, "that fellow had guns there and did not have much use for us fellows, and that it would be a good idea for us to go home." And that he went home and told his father that Emmons had threatened them. He testified that he was standing 8 or 10 feet from the defendant when he did the shooting, and that defendant called to Emmons to stop before he shot him.

Bert Reed testified: That he was defendant's son, 17 years of age. That he went with his father and brothers to Emmons' place on the evening of September 18th. That they went across

a field towards Emmons' barn. That when they got near the barn he said to defendant: "Them men are sitting up by the barn there," and with that Emmons jumped up and took a run towards the house, and the defendant began hollowing "Stop!" at him three or four times. And then fired four shots at him, and Emmons fell.

J. E. Evans testified that he had met the deceased the Friday night before he was killed at his place. The record reads as follows:

"Well, he told me—I asked him how he liked his community, and he said, 'Fine.' He said: 'I have good neighbors here. I have been living here some time.' And he says, 'I get along with all my neighbors fine with the exception of one man, and that is that man that lives at that light,' and pointed to Reed's house, 'and that man, Reed, over there, I can't get along with him. I tried to get along with him'—I think he said 'three years'— and he said, 'I finally found out I could not get along with the damned son of a b——, and quit trying. He run over me from time to time, and I got tired of it.' He says, 'If he attempts to run over me, or his damned crowd, I intend to shoot at him with that as long as there are any loads in it, and then throw the frame at him,' showing a shell gun. Q. Did you ever indicate that to the defendant? A. Yes, sir. Q. When was that? A. On Sunday following that Friday."

Milton J. Lovell, for the defendant, testified that he had a store and was postmaster at Stokes, and that on Sunday preceding the homicide the deceased bought a box of shot-gun shells .from him and stated that he was going over to Johnson to tell him about· Reed's stock being in Johnson's crop, and said, "I expect we will have some fun in the morning." He further testified that it was not an unusual occurrence for deceased to buy shells from him.

*John T. Hays and L. M. Keys, for plaintiff in error.—

On question of private counsel in prosecution: Hughes Crim. Law & Procedure, sec. 2892, page 755, and citations; Bemiel v. State (Wis.) 37 N. W. 244; State v. Orick (Mo.) 17 S. W. 176; Com. v. Knapp (Mass.) 10 Pick. 477; Com. v. Williams

(Mass.) 2 Cush. 582; *Carlial v. State* (Miss.) 19 So. 207; *Com. v. King* (Mass.) 8 Gray, 501; *State v. Crafton* (Iowa) 56 N. W. 257; *People v. Wood* (Mich.) 58 N. W. 638; *State v. Howard* (Mo.) 24 S. W. 41; *People v. Thacker* (Mich.) 66 N. W. 562.

On requested instruction on law of self-defense: *Kirk v. Territory*, 10 Okla. 46; *Johnson v. State* (Texas) 50 S. W. 343; *Hood v. State.* (Miss.) 27 So. 643; *State v. Abbott*, 8 W. Va. 741.

On question of improper argument by prosecuting attorneys: *Bilton v. Territory*, 1 Okla. Cr. 566; *Holden v. State* (Ark.) 25 S. W. 279; *Beason v. State* (Texas) 67 S. W. 96.

*Charles West*, Atty. Gen., and *Chas. L. Moore*, Asst. Atty. Gen., for the State.

DOYLE, JUDGE. (after stating the facts as above). The defendant was indicted for murder, and was tried and convicted of manslaughter in the first degree. The defense was justifiable homicide. The petition sets forth 17 assignments of error, all of which are argued in the brief. We will consider them and state our conclusions thereon in the order named.

The first assignment is that: "The court erred in overruling the motion to set aside the indictment." Under this assignment it is contended that, as the crime is charged to have been committed before the adoption of the Constitution, it could only have been prosecuted upon an indictment returned by a grand jury, consisting of not less than 12 or more than 16 jurors, as provided by the laws in force in the territory of Oklahoma at the time so charged.

The fifth amendment of the Constitution of the United States provides.

"No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury."

Under this provision and the federal and territorial laws then in force, the defendant could only be prosecuted by indictment. The act of criminal procedure of the territory provided (section 5349, Wilson's Rev. & Ann. St. 1903) that:

"An indictment cannot be found without the concurrence of at least twelve grand jurors."

Section 5151, Wilson's Rev. & Ann. St. 1903, provides that:

"The procedure, practice and pleadings in criminal actions not specifically provided for in the Code of Criminal Procedure, shall be in accordance with the procedure, practice and pleadings of the common law."

Under the common law a grand jury consisted of not less than 12 nor more than 23 jurors. Section 18 of the Bill of Rights provides:

"A grand jury shall be composed of twelve men. Any nine of whom concurring may find an indictment or true bill."

Upon the agreed statement of facts the grand jury which returned the indictment consisted of 12 jurors. Before any person can be lawfully tried for a crime, he must be accused thereof according to law. The question is: Was the indictment found by competent authority? Has the defendant been granted all the rights that the law secures to him?

The record in this case does not show that the defendant was denied any right to which he was entitled under the laws in force when the crime was committed. There is nothing to show that the indictment was not found by the unanimous concurrence of 12 grand jurors, and we have no reason to presume that it was found by a less number, or that it was found by the concurrence of only 9 grand jurors.

Counsel for defendant cites the case of *State v. Kingsly*, 10 Mont. 537, 26 Pac. 1066. In that case the court say:

"In *State v. Ah Jim*, 9 Mont. 167, 23 Pac. 76, this court held that a party could be prosecuted by indictment which had been found by a grand jury of seven persons, although the alleged offense was committed within the territory of Montana when the statute fixed a higher number, and that the substantial rights of the accused were not thereby impaired, and that this ruling, in its consequences, was not *ex post facto*."

As the question of a number less than that required by the common law does not arise upon the record in this case, we deem

2 Cr.—39

it unnecessary to review the authorities. We are clearly of the opinion that the indictment was found by competent authority.

The second assignment is: "That the court erred in overruling defendant's demurrer to the indictment." The only ground alleged in said demurrer is that the facts stated do not constitute a public offense. There is no merit in this assignment. The indictment is clearly sufficient.

The third assignment is:

"That the court erred in granting the motion of plaintiff below, without any showing therefor, to indorse the names of witnesses for the prosecution upon the indictment."

The record shows that the defendant was furnished with a list of witnesses, together with their post office addresses five days before the trial. Section 5552, Wilson's Rev. & Ann. St. 1903, provides:

"The court or judge may, at any time direct the names of additional witnesses for the prosecution to be indorsed on the indictment, and shall order that such names be furnished to the defendant or his counsel."

There is nothing of substance in this assignment.

The fourth assignment is:

"That the court erred in sustaining the challenge of the state to the juror H. L. Thorp; no sufficient cause existing therefor."

The juror, on being sworn to make true answer, in substance said:

"That he had conscientious scruples against the infliction of the death penalty where the evidence justifies and the law authorizes it."

He was clearly disqualified, and the court was right in sustaining the challenge for the cause.

The fifth assignment is:

"That the court erred in permitting T. W. Connor, who was not county attorney, or deputy county attorney, to appear and prosecute said cause, and to make the closing argument."

The record shows that, when the statement of the case on behalf of the prosecution was made to the jury, counsel for the

defendant objected to any private counsel and especially to Mr. Connor appearing on behalf of the state, and offered to prove:

"That the county attorney was personally present in court attending to the prosecution of this case, and that he is in no wise disqualified or disabled from the performance of that duty. That Hon. Thos. Connor is not a deputy county attorney, and has not been appointed by the court for the purpose of prosecuting this case."

Whereupon the state admitted these facts as stated. The court overruled the objection and allowed an exception. When the court instructed the jury, counsel for defendant renewed this objection to Mr. Connor, and requested that H. L. Standeven, county attorney, be required to make the closing argument. No proof was offered that Mr. Connor had any private interest in the case. The question involved in this assignment of error requires us to determine whether, upon the trial of a person accused of a crime involving his life, or his liberty for life or for a term of years, private counsel may participate in the prosecution of the accused against his consent.

In the case of *Mahaffy v. Territory of Oklahoma,* 11 Okla. 213, 66 Pac. 342, it was held that, under section 5056, St. 1893, "only the county attorney or deputy county attorney appointed by him could appear before the grand jury to give advice or information." That is not the question in this case. The record shows that Thos. Connor was the county attorney of Kiowa county at the time the offense was committed, and there was no proof offered that Mr. Connor appeared at the instance of private parties to assist the county attorney in the trial. From our examination of the authorities, we find that in the various states this practice is permitted, with the possible exception of the states of Massachusetts, Michigan, and Wisconsin.

It was first brought to the attention of the courts of Massachusetts in the famous case of *Com. v. Knapp,* 10 Pick. 477, 20 Am. Dec. 534, where Daniel Webster appeared on behalf of the prosecution acting without any pecuniary inducement. The court,

under these circumstances, held it permissible for the prosecuting officer to obtain help in a proper case as in this instance.

In *Meister v. People,* 51 Mich. 99, the court held:

"Counsel employed and paid by private parties will not be allowed to prosecute in a criminal case against the objection of the respondent, especially where the private party has a pecuniary interest in the conviction of the accused, but that preliminary examinations on charges of felony may be conducted by counsel employed and paid by private parties."

In *People v. Wood,* 99 Mich. 620, 58 N. W. 638, the same court held:

"There is no merit in the complaint made of the fact that Mr. Kinnane was permitted to assist the prosecutor at the trial. The record fails to disclose that any objection was taken until after the verdict, and when the objection was raised, on a motion for a new trial, Mr. Kinnane showed by affidavit that he had no private interest in the prosecution of the case."

Under the law of Wisconsin, the trial judge is given the power of appointing an assistant counsel, where he thinks the public interest requires it, and providing that such assistant counsel shall be paid out of the public funds. Construing this statute in *Biemel v. State,* 71 Wis. 444, 37 N. W. 244, the court held:

"That an attorney paid by private parties was not a proper attorney to prosecute the case on behalf of the state."

We cannot accept the rule enunciated in the foregoing case. In *State v. Fitzgerald,* 49 Iowa, 260, 31 Am. Rep. 148, the court say:

"A. L. Crookham appeared at the instance of private parties to assist the district attorney in the trial of the cause. There was no order of the court appointing said Crookham as associate counsel. The defendant objected to his appearance, and objected to his making any argument in the cause, and to his taking any part therein. The objection was overruled, and the defendant insists that this ruling was erroneous. We think the practice of allowing district attorneys to have the assistance of associate counsel in the trial of criminal cases has been too long acquiesced in, in this state, to be now called in question. Crookham did not appear as an assistant without the consent of the district attorney

and the court. If he did, the objection to his taking part in the trial would have been sustained. We can see no objection to leaving the matter of allowing associate counsel in the discretion of the court and district attorney."

In the case of *Burkhard v. State,* 18 Tex. App. 599 the court say:

"There is no law of this state prohibiting counsel other than the district and county attorney from appearing and prosecuting a case in behalf of the state. It has been the practice always in this state to permit attorneys employed by private prosecutors to assist the district or county attorney in the prosecution of a case. This practice has been known to all the Legislatures that have assembled in the state, and if it be an illegal or improper practice, as is contended by counsel for defendant, it is indeed strange that it has been so long and so universally tolerated by the law-making power and sanctioned by the courts. It seems that, in some states, this practice is not allowed; but in most of the states it is sanctioned. It is, however, the duty of the district or county attorney to reserve to himself the direction of the case. This he should never surrender to assistant counsel. Whart. Pl. & Pr. 3555, and cases there cited; 1 Bish. Cr. Pr. 3281. The court did not err in overruling the defendant's objections to permitting the district attorney to avail himself of assisting counsel in the prosecution, both in the conduct and argument of the cause."

In the case of *State v. Wilson,* 24 Kan. 189, 36 Am. Rep. 257, Justice Brewer, delivering the opinion of the court, said:

"Public justice sometimes requires that the public prosecutor shall have assistance, and that too when the assistance can only come from private sources. The county attorney may be crowded with business, and unable to give due attention to the preparation or trial of the case. He may be young and inexperienced, and the defendant wealthy or with wealthy friends, confronts him with a long array of the ablest and most experienced counsel. Neither he nor the court, nor both together, can employ counsel at the public expense. No one is expected, or will be apt to waste time and labor without compensation. Parties interested in, or affected by, the crime, may stand ready to furnish him the assistance he needs. Does not public justice require that he be permitted to avail himself of such offered assistance? If the argument of defendant were correct, the county attorney, although

needing and wishing assistance, could neither employ it, nor accept it when employed by others. We think the true construction is to take the statute as it reads, as prohibiting the public prosecutor from accepting private compensation and giving him the control of all public prosecutions, leaving to him a discretion as to the matter of accepting offered assistance, subject to the power of the court to interfere and prevent any oppression of the defendant, and holding him personally responsible for any violation of the statute or malfeasance in office."

See, also, *State v. Howard*, 118 Mo. 127, 24 S. W. 41; *State v. Orrick*, 106 Mo. 111, 17 S. W. 176; *Carlisle v. State*, 73 Miss. 387, 19 South. 207.

The laws of this state only prohibit persons other than the county attorney, or his deputies, from performing such acts in the prosecution of crimes as are strictly official, such as appearing before and advising the grand jury, verifying informations, approving complaints, etc. The assistance of private counsel in the trial of criminal cases is not prohibited. This is a matter entirely in the discretion of the county attorney, who has complete control in conducting public prosecutions, subject only to the supervision of the court upon the trial. Regardless of the ability and the zeal of county attorneys, the proper administration of the criminal law often requires such assistance. County attorneys are prohibited from accepting private compensation. As wealth, influence, and eminent ability are often arrayed on the side of the defense, it is well and wise that the policy of the law permits such assistance to the prosecution.

The sixth assignment is that: "The court erred in admitting certain incompetent testimony over the objections of the defendant." We have examined the record upon these matters and do not think the objections were well taken.

The seventh assignment is that: "The court erred in refusing to admit certain competent testimony offered by the defendant." Counsel complains that:

"The court restricted the defendant in his defense in showing the difficulties between the defendant and the deceased which

led up to the homicide, but not to go so far as to show who was right or wrong in these difficulties."

Whether the defendant had or had not the right to pasture his live stock on the land in dispute, or whether said live stock had been lawfully distrained, were questions which did not arise upon the proof. The record discloses that the court allowed the greatest latitude in the introduction of evidence. There is no merit in this assignment.

The eighth assignment is that: "The court erred in sustaining the objection of the state to the deposition of Ely Horton." In this deposition an attempt was made to show by this witness that the deceased had used threatening language toward defendant and his family, about six months prior to the homicide. It will be conceded that threats made by the deceased, when communicated to defendant, are sometimes competent evidence in his behalf, and in some cases they are admissible, although never communicated. *Price v. United States,* 1 Okla. Cr. 291, 97 Pac. 1050. The deposition was offered for the purpose of proving a case of justifiable homicide in self-defense, and its admissibility depends upon the facts and circumstances of the homicide. If A. threaten the life of B., this fact will not of itself justify B. in killing A. There must be some overt act on the part of the person making the threat, from which it appears that there is real or apparent danger of the execution of the threat.

Mr. Wharton, in his work on Criminal Evidence, par. 757, says:

"Can evidence to the effect that the deceased, prior to a homicide, threatened the defendant's life, be received? And, if so, is it a prerequisite to the proof of such threats that they should be shown to have been communicated to the defendant? Certainly, if such evidence is offered to prove that the defendant has a right to kill the deceased, there being no proof of a hostile demonstration by deceased, then it is irrelevant. If A. threatens B.'s life, and this threat is known to B., B.'s duty is to have A. arrested by due process of law, not to shoot him; the right of self-defense being conditioned on an apparent attack. On the

other hand, if the question is as to which party in the encounter is the assailant, then it is admissible to prove by the prior declaratons of either that the attack was one he intended to make. Threats to this effect by the defendant are always, as has been seen, admissible; and it is properly held that there is equal reason, supposing a collision between the deceased and the defendant to be first proved, for the admission of threats by the deceased."

And Kerr on Homicide, p. 423, says:

"Where it is clearly and unequivocally shown that the defendant was the aggressor, and there is no pretense that 'the deceased was about to carry the threats into execution, or that the defendant had reasonable grounds to believe and did believe that such was the case, evidence of such threats by the deceased, although they were communicated to the defendant, is inadmissible."

While justice and the law demand that no competent or material evidence favorable to the defendant shall be excluded, under the conceded facts in this case, the court properly sustained the objection to said deposition.

The ninth assignment is: "That the court erred in refusing to give the instructions and each and all of them asked by the defendant, 22 in number." We have carefully examined the instructions requested and refused by the court, and we are confident that this assignment is not well founded.

In defendant's brief but one of said instructions so requested has been specifically considered, being instruction No. 14, refused, which reads as follows:

"You are instructed that if you believe from the evidence, that, from knowledge or information believed by defendant, it, at the time of the homicide appeared to the defendant that the deceased had within his residence deadly weapons, and that the feelings of the deceased toward the defendant were of such a hostile character that he desired to kill him or do him some great bodily injury, and that he had previously made threats that he would do so, of which threats the defendant then and there had information, and that to the defendant it then appeared that the deceased was running toward his residence for the purpose of arming himself with such weapons, and therewith and from behind cover of the house shooting the defendant, and that, acting solely with the

view of protecting himself from such apparent injury and attack, and believing that the same was necessary to protect himself from such injury, the defendant shot and killed the deceased, such act would be justifiable homicide, and you should acquit the defendant."

This instruction is obviously erroneous, under the conceded facts in this case, because it fails to put the proposition to the jury that to justify a homicide in self-defense the threatened assault must be of such a character as would induce in the mind of a reasonable man a fear of death or great bodily harm, and said instruction wholly fails to consider that where the defendant is in a place where he has no right to be, the right of self-defense can only arise when no other means to avoid the threatened danger are apparent, and that it was the duty of the defendant to escape by retreating unless prevented by the suddenness or by the fierceness of the assault, rather than to take the life of his assailant.

The only authority that counsel cite and seem to rely upon to sustain this instruction is the case of *Kirk v. Territory of Oklahoma,* 10 Okla. 46, 60 Pac. 797. The pertinent part of the opinion in that case is as follows:

"He claimed he acted in self-defense. He testified: That there had long been an ill feeling existing between him and the deceased. That they were both at the home of his brother, and had been staying there for some time. It was his temporary home, and she was there on a visit. That she had become highly incensed at him a few weeks before at their father's home in the Chickasaw country, and that she had threatened to kill him and had attempted to get a gun for the purpose of executing her threat. That she had written letters to a couple of friends in Texas, who were desperate characters, requesting them to seek an opportunity to take the life of the defendant. That she was an expert and skillful shot with rifle or revolver, and always traveled with a gun and revolver in her buggy. That she brought a large dirk knife and Winchester rifle with her to her brother's when she came on the last visit, and that she had followed him to his brother's for the purpose of seeking an opportunity to take his life. That she was hostile to him because he had found fault with

the character of company she kept, and that she was of a vicious and dangerous disposition. He further claimed: That on the morning of the homicide she became enraged at him, and declared that she would kill him; that she then seized a six-shooter in the room where they were, and attempted to take his life with it; that he grasped the six-shooter, and wrenched it from her; that then she took the loaded Winchester from under the bedclothes on the bed where it was kept, and was in the act of drawing this on him when he fired the fatal shot. He swore that he believed she intended to take his life with the Winchester, and that he believed it necessary to fire the shot to prevent her from killing him. This evidence was not contradicted, except in so far as it might have been at variance with some of the circumstances, or some of his former statements. The testimony of the defendant embraces the elements of self-defense. It was competent to go to the jury and it was for the jury to determine what, if any, credit they would give it. It is the duty of the court to instruct on the evidence as presented. It is not for the court, in ruling upon evidence or framing instructions, to determine the probative force of evidence. If the evidence is material, relevant, and competent, it is for the jury, and instructions bearing upon the evidence without respect to its weight or credibility cannot be deemed irrelevant.

"The defendant requested the court to give request No. 3, as follows: 'The jury are instructed, as a matter of law, that if a person believes, and has reasonable cause to believe, that another has sought him out for the purpose of killing him, or of doing him great bodily harm, and that he is prepared therefor with deadly weapons, and the latter makes demonstrations manifesting an intention to commence an attack, then the person so threatened is not required to retreat, but he has a right to stand and defend himself, and pursue his adversary until he has secured himself from danger; and if, in so doing, it is necessary, or it appears upon reasonable grounds to be necessary, to kill his antagonist, the killing is excusable upon the grounds of self-defense.' This request was refused and excepted to. Under the evidence of the defendant this instruction was proper and should have been given. There was no question but that the defendant was at a place where he had a right to be. He was at the place of his residence. As to whether he provoked the assault made by the deceased was a question for the jury. The court could neither assume that he did, or did not, and, if the jury believed the evi-

dence of the defendant, then they might reasonably find that the deceased was following him up to the place of the homicide, armed with a dirk knife and Winchester, for the purpose of carrying out her previous threats."

The Kirk Case is clearly not in point. In that case the defendant was where he had a right to be, and doing what he had a right to do, and he was not the aggressor, and the testimony tended to show that there was an imminently dangerous assault, and that he had not brought on the occasion. The right of self-defense is founded upon grounds of necessity. Under every principle of the law it was the duty of the defendant to have departed from the premises of the deceased. It is useless to argue in the face of such testimony as given by the defendant and his sons in connection with the undisputed fact that they were trespassers at the time upon the homestead of the deceased, that there are any of the elements of self-defense or imperfect self-defense in this case.

The charge given, while not strictly correct, when considered as a whole in connection with the evidence, was more favorable to the defendant than the law would authorize. On the undisputed facts, there were none of the elements of manslaughter in the second degree, and the court should have excluded this degree from the consideration of the jury, and only by the remotest inference was there any evidence of manslaughter in the first degree. However, these instructions were requested by the defendant.

The court further charged: "You are instructed, gentlemen, that under the evidence in this case there is no element of excusable or justifiable homicide." Of this the defendant complains. Section 5518, Wilson's Rev. & Ann. St. 1903, provides: "In charging the jury, the court must state to them all matters of law which it thinks necessary for their information in giving their verdict." The law of justifiable homicide in self-defense under the evidence had nothing whatever to do with this case. The defendant in his evidence admitted the killing was wilful, deliberate, and premeditated, that there was no legal provocation, although he testi-

fies that he believed deceased was running to his house to get a gun, and for this reason, as threats had been made, he believed that his life was in danger. Assuming that defendant did believe this, under the circumstances, it constitutes no element of justification in self-defense.

While the necessity for taking human life need not be one arising out of real or actual or imminent danger in order to excuse the slayer, as he may act upon the belief arising from appearances which give him reasonable cause to apprehend danger of death or of great bodily harm, although there may be no actual danger, and his guilt must depend upon the circumstances as they appeared to him, yet the danger must not be brought on by the wrongful conduct or unlawful acts of the slayer, and no person has the right to kill another through unfounded fear or cowardice. It may be that the deceased intended to arm himself. This he had a lawful right to do, for his own protection, and the protection of his home against the armed invasion of the defendant and his sons. The defendant provoked the difficulty. He was in a place where he had no right to be, and doing a thing he had no right to do, and no assault had been made upon him. If he was in fear, there was nothing to prevent him from returning to his own home. There is no intimation or claim that he withdrew, or attempted to retreat. Under the facts and circumstances in evidence, the defendant went to Emmons' house in search of him, with the purpose and intention of killing him. It cannot be contended that a man can arm himself with a 45-caliber Winchester repeating rifle, charged with a dozen loads, and with this murderous weapon go to the home of another, and without provocation shoot him down in his dooryard, and then be heard to claim the right of self-defense. The error of the argument on behalf of the defendant is in making the general rule as to the respective functions of court and jury applicable equally to a case in which there is some substantial evidence to support the right asserted and a case in which there in an entire absence of evidence to establish such right. The plea of justification protects only those who are without fault. Under

these facts it was proper for the court to so instruct the jury. Such an instruction was a declaration of the law, and not an invasion of the province of the jury to determine the facts.

"Where there is testimony which has any legal effect, it would be error in the court to determine the weight of it, or the fact which it did or did not ascertain; but whether evidence tends to prove anything pertinent to the issue is a question for the court." (*Harrison v. State,* 24 Ala. 67, 60 Am. Dec. 450; *State v. Rheams,* 34 Minn. 18, 24 N. W. 302.)

In the case of *State v. Rheams. supra,* Dickinson, Judge, delivering the opinion of the court, said:

"In reviewing the action of the court declaring to the jury that the evidence did not show a justification, we must assume that the defendant was, in fact, acting upon the defensive, and that he did not himself provoke the attack of Chase, or seek an occasion for killing him. We will also assume, although we are not clearly satisfied that the evidence sustains the assumption, that the defendant believed that he was threatened with great bodily harm from his assailant, and not a simple battery, and that the circumstances were such as to justify a man of ordinary fortitude in so believing; but more than this is necessary to sustain the defense of justification.

"In *State v. Sorenson,* 32 Minn. 118, 19 N. W. 738, it was declared that the right to kill an assailant in self-defense can only be resorted to in extremity, and when no other practicable means to avoid the threatened harm are apparent to the person assailed, and the duty was recognized, in a case such as we have assumed this to be, to escape by retreat, unless that is prevented by some impediment, or by the fierceness of the assault, rather than to take the life of the aggressor.

"In view of this duty on the part of the defendant, the evidence falls short of showing a justification. The assault was in the daytime, in the village street. The deceased was unarmed, while the defendant had a loaded revolver. When the defendant commenced firing at the deceased, the parties were so far apart that the opportunity for retreat was perfectly apparent, and it was equally apparent that, if the defendant should avail himself of that opportunity, the danger of personal injury was not immediate. He was not surprised by an assault so suddenly made that he had no time to consider as to the means of escape. He was expecting

such· an assault, and had prepared himself to meet it.    He knew the way of retreat through the public street was open.    His weapon was in his hand, and had been once discharged before the deceased attempted to touch him.    Possessed of the advantage of being thus armed, notwithstanding the great physical power of the deceased, and with the obvious opportunity for avoiding the threatened injury, the law forbade that he should attempt the life of his assailant, for the necessity was not then apparent.    It is true that he ran away from Chase as the latter came after him; but the circumstances attending the flight deprive it of the character of a real attempt by that means to avoid the necessity for taking the life of the aggressor.    So far as the question under consideration is concerned, he might as well have stood in his tracks without retreating, and have killed Chase as he approached him.    His duty was to flee, and thus avoid the necessity for killing his adversary.    His act was to flee, and at the same time, and before the necessity became apparent, to kill his adversary.    He commenced shooting immediately upon the commencement of the assault, and continued shooting, unnecessarily retarding his own flight by turning to aim and fire, until his pursuer fell.    It seems at least probable that, if the defendant had not thus retarded his flight, he would have completely escaped from Chase, for his own testimony is: 'I can hardly tell whether one or the other gained, but I think we kept pretty even, or once in a while he gained.' Taking the evidence relied upon by the defendant to be true, we think that it was legally insufficient to show a justification. This being so, it was the province of the court to so instruct the jury.    Such an instruction was a declaration of the law, and not an invasion of the province of the jury to determine the facts.

"In *State v. Taunt,* 16 Minn. 109 (Gil. 99), it was said (page 104) : 'Where there is testimony which has any legal effect, it would be error in the court to determine the weight of it, or the fact which it did or did not ascertain; but whether evidence tends to prove anything pertinent to the issue is a question for the court.' See, also, 1 Greenl. Ev. par. 49; *Chandler v. Von Roeder,* 24 How. 224, 16 L. Ed. 633; *Garnett v. Kirkman,* 33 Miss. 389."

In *Hoover v. State,* 35 Tex. Cr. R. 342, 33 S. W. 337, Hurt, Presiding Judge, delivering the opinion of the court, said:

"But, conceding that defendant's version is correct, the state replies that he is estopped from pleading that his life or body

was in danger, because he did that which, if not intended, was in its very nature calculated to induce the deceased to do just what he did do, and that appellant must have known, and did know, that his own violent conduct caused the deceased to act as he did, and this was known to appellant before he shot. A.'s life is threatened by B. A. arms himself with a pistol, and goes into the house of B., pistol in hand, ready for immediate use, and remarks to him, 'I understand that you intend to kill me.' B. moves his hand to his side. A. shoots, and kills him. Under this state of case, B. would have been excused if he had drawn and fired. But what, in fact, was appellant's intention when he entered the saloon, or why, or for what reason, did he kill deceased? It is true he states that deceased threw his hand to his side, and that he was moving towards the counter, and that he fired, that his purpose was to obtain a pistol. Concede all this. Concede that appellant believed his life in danger, that in fact deceased was attempting to procure a pistol for the purpose of killing appellant, and that appellant so understood his conduct. Still his own violent conduct was not only calculated to induce deceased so to act, but was the natural result of the conduct of appellant. No rational man could have expected anything else than a a resort to deadly weapons, and while it may be true that appellant had good reason to, and did, from the conduct of deceased, apprehend danger to his life, etc., yet he knew that his own acts had caused the danger. But why did appellant kill deceased? He answers this question by deliberately stating that he did not kill deceased because of the insulting language towards his female relative, but because he (deceased) had threatened to kill him. If this be true, all that deceased did ceases to be a factor in self-defense. Why? Because the acts of deceased did not induce appellant to kill him; he being killed because he had threatened to kill appellant. We have therefore this simple proposition: A. threatens to kill B. B. arms himself, goes in the house of A., and kills him, because he had threatened his (B.s) life. There is neither manslaughter, self-defense, nor anything else short of murder, in this state of case."

We are of opinion that the trial court did not err in saying to the jury that under the evidence there was no element of excusable or justifiable homicide.

In the eleventh assignment defendant complains of the con-

duct of counsel for the state, as follows: That Hon. H. L. Stand-even, county attorney, in the opening argument, referred to the defendant and to the crime in which he was then on trial by stating:· "That this crime is a cold-blooded murder, and the most cold-blooded crime ever committed in this county." Upon the attention of the court being called to this remark by the objection of counsel for defendant, the judge admonished the jury not to consider the remark. That in the closing argument on behalf of the state Thos. W. Connor, in referring to the widow of the deceased, Emmons, turning toward the defendant, said: "Saw this fiend incarnate approaching with this weapon and turned and ran into the house to her baby." That further in said argument the said Thos. W. Connor, describing the scene of the wife, near the body of the husband immediately after he was shot, said: "The shot that was fired by the defendant not alone killed Elmer Emmons, but shot the brightest star of hope from her future life ·in this world." Defendant objected to each of these remarks, and the court instructed the jury not to consider the same. · This it is claimed constituted misconduct on the part of the county attorney ·and the assistant counsel, and for this reason a reversal of the judgment is asked. The remarks of counsel must be considered and construed in reference to the evidence, and it is doubtful if they were objectionable. However, the trial court sustained the objections and in this way condemned the language used. In order to constitute reversible error, the impropriety indulged in must have been such as may have influenced the verdict. The verdict returned shows that no injury was suffered by the accused.

In the twelfth assignment counsel complains that the sentence is excessive, and state in their brief:

"The punishment imposed, at the age of this defendant, amounts practically to a life sentence, and we think, under the facts shown, that it is too severe, even if, under the errors hereinbefore urged the defendant be held not entitled to a reversal and a new trial."

We cannot agree with counsel, and we believe that counsel

should congratulate themselves upon the mildness of the verdict returned and the clemency of the court in fixing the penalty, as it clearly appears from the record that the defendant is guilty of murder.

The thirteenth, fourteenth, and fifteenth assignments relate to the refusal of the court to grant the motion for a new trial, and motion in arrest of judgment, and for errors of law. The questions raised have been herein fully considered.

In the sixteenth and seventeenth assignments defendant complains that the amount of the bail bond, $10,000, is excessive, and that the time allowed for giving said bond, to wit, 90 days from date of the sentence, was too limited. We deem these assignments hypercritical.

The case was ably tried by the learned counsel on both sides, and the various assignments of error have been ably and elaborately presented and argued in this court. The jury found the defendant guilty of manslaughter in the first degree. Yet it seems clear to us from the evidence that the defendant should have been convicted of murder. Section 5618, Wilson's Rev. & Ann. St. 1903, requires us to "give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the accused." The letter and spirit of this law is that, if the defendant has had a fair trial, and if this court is satisfied that the conviction is sufficiently supported by competent evidence, and the verdict against him was not reached by error, or as the result of passion and prejudice, the conviction should be affirmed.

After a careful examination and consideration of the entire record, we are of opinion that the defendant had a fair and impartial trial, and that no error was committed prejudicial to his substantial rights.

The judgment of the district court of Kiowa county is therefore affirmed.

FURMAN, PRESIDING JUDGE, and OWEN, JUDGE, concur.