**Allen Clayburn JUSTUS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–74–713.**

Court of Criminal Appeals of Oklahoma.

Sept. 17, 1975.

Rehearing Denied Nov. 25, 1975.

Don Anderson, Public Defender, Oklahoma County, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., for appellee.

BUSSEY, Judge:

Appellant, Allen Clayburn Justus, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Oklahoma County, Case No. CRF–73–3180, for the offense of Murder in the First Degree, in violation of 21 O.S.Supp. 1974, § 701.1, ¶ 2. In accordance with the provisions of 21 O.S.Supp.1974, § 701.3, the defendant was thereafter sentenced to suffer death, and from said judgment and sentence a timely appeal has been perfected to this Court.

At the trial, Phillip Eugene Keen, M.D., a medical examiner for the State, testified that he examined the body of Robert Holmes on October 9, 1973, and determined the cause of death to have been a gunshot wound to the head which entered the right temple, transacted the brain stem, and exited behind the left ear. He further expressed the opinion that death had likely occurred at least five hours prior to his examination at 1:40 p. m.

Ted Yokum, a night dispatcher for the Yellow Cab Company, next testified that Robert Holmes was a driver for that company on October 9, 1973, and that the witness last had contact with him at about 3:00 o'clock that morning when he first dispatched him to a grocery store at 16th and Drexel and then to the South Point Apartments in the 900 block of S.W. 60th.

Carol Lavon Edwards then testified that at about 3:00 a. m. on October 9, 1973, she telephoned for a Yellow Cab to take her from a grocery store at 16th and Drexel to S.W. 47th and Pennsylvania. While en route in cab no. 50, she overheard the dispatcher direct the driver to the South Point Apartments.

Officer Marvin Doherty, assigned to the crime lab division of the Oklahoma City Police Department, next testified that at about 11:00 a. m. on October 9, 1973, he was dispatched to the South Point Apartments where he processed a Yellow Cab no. 50 for latent fingerprints and photographed the scene. Although numerous latent fingerprints were found both inside and outside the cab, none could be identified as those of the defendant. He identified State's Exhibits Nos. 3 through 6 as photographs of that scene and all but Exhibit No. 4 were then admitted into evidence. State's Exhibit No. 2 was identified as a projectile found in the right-rear floorboard of the cab, and he observed that the windshield appeared to have been cracked, but not penetrated, by a sharp object near the left side.

Phyllis Hemphill, manager of the South Point Apartments, then testified that at about 7:00 a. m. on October 9, 1973, she noticed a Yellow Cab no. 50 parked in the apartment parking lot. At about 10:30 a. m., she approached the cab to place a note on the windshield because the vehicle was occupying two spaces, but noticing blood running from the door, she telephoned the police.

Ray Lambert, firearms examiner for the Oklahoma State Bureau of Investigation, next testified that he had examined State's Exhibit No. 2, and determined it to have been a .38 caliber bullet. That exhibit was then admitted into evidence.

Detective Jerry Guinn, assigned to the homicide and robbery division of the Oklahoma City Police Department, then testified that he participated in the arrest of the defendant on November 2, 1973, and identified State's Exhibit No. 7, as a Waiver of Rights form, executed by the defendant shortly before he agreed to give a video-tape statement regarding the alleged offense the following night. That exhibit was then admitted into evidence. This witness also testified that the location described by the defendant in his video-tape statement, as the place of the homicide, was within Oklahoma County, Oklahoma.

Officer Bob J. Coffia, assigned to the special services division of the Oklahoma City Police Department, next testified that he was trained in the use of video-tape equipment and that he recorded the video-tape statement of the defendant, State Exhibit No. 8, in the police station at about 9:00 p. m. on November 3, 1973.

This video-tape was then exhibited visually and audibly to the jury, after which the State rested its case in chief. Following an evidentiary hearing, outside the presence of the jury, the court previously had ordered the deletion of certain incompetent matter from this video-tape, but had overruled a Motion to Suppress wherein the defendant asserted that he had not knowingly, voluntarily and intelligently made the same with the benefit of his Miranda rights.

In this video-tape statement, the defendant first acknowledged that he had read and understood his rights, and with reference to the subject offense was then interviewed in part, as follows:

"OFFICER GUINN: Would you tell me in your own words the knowledge that you have pertaining to this homicide?

"MR. JUSTUS: I will. I am not sure of the date. But, this certain night, I called up the Yellow Cab Company.

I requested a cab to come to the South Point Apartments.

I then ran down to the South Point Apartments and waited at Apartment 3, downstairs.

Uh, the cab pulled up. I got in the car. We left and I directed him to 74th Street. That is an apartment complex out there.

Traffic was too busy so I couldn't do what I wanted to do at that time, so I directed him over to Western. I am not sure of the street, but right off Western.

I had him stop. When he stopped, I cocked my pistol and shot him.

Then I moved him over and drove to the South Point Apartments, took his money, wiped the car down and walked home." [Tr. 279 & 280]

Elsewhere in this statement, the defendant disclosed that the money taken amounted to approximately $30.00 plus some change, and that he perpetrated the crime alone. He also related that he had worn gloves, and that the gun used was a .38 caliber chrome-plated Colt Revolver which he later had Bobby Williams throw in the trash. He immediately burned the victim's wallet and personal papers at home in the presence of his wife, and washed the blood from his clothes in cold water. He did, however, notice from the personal papers that the name of the victim was Ralph or Robert Holmes.

Bobby Joe Williams testified as the first defense witness that he was a friend of the defendant and they were both arrested together on November 2nd, and that the defendant's wife was also arrested the same night. The following day he gave a statement to the police implicating the defendant because he was told that he would be released if he would do so. However, he further testified that the defendant had never admitted to him any involvement in the death of the victim, and that he had never seen the defendant with a gun, nor thrown one away for the defendant.

Shortly following their arrest, he testified that he overheard Detective Knight say that he would like to see the defendant get his head blown off and that he would not mind doing so, and the following day he heard that officer tell the defendant that if he did not make a statement to clear up this murder case he would never get out of jail. During cross-examination the witness admitted a conviction for Murder before the same court one month earlier, which was on appeal. Although he would not acknowledge the statement, he was also impeached with his previous unsworn statement wherein the defendant purportedly admitted the crime to the witness.

Jimmy L. Justus next testified that he was the defendant's father and that at about midnight on the day of the defendant's arrest he received a telephone call from Detective Knight requesting that he come to the police station and encourage his son to give a statement. He there observed the defendant's eyes to be glassy, and the defendant kept rolling them as if he could not focus. The defendant, at that time, denied any knowledge of the matters upon which he had been questioned and asked his father to get him a lawyer.

The defendant was the final witness in his behalf and testified that while under the influence of LSD he was threatened and coerced into making the video-tape confession after being coached and rehearsed, and that the contents thereof were not true. The defendant explained that shortly before being arrested he had purchased some LSD at which time he took one tablet, but then took the remaining quantity just prior to his arrest to keep from being caught with them. He was first told that he was being arrested for back tickets, but before arriving at the police station he was told he had been arrested for Murder because he was with Bobby Williams. Despite his repeated request for an attorney, he was thereafter questioned several times and told he would not need an attorney until transferred to the county jail, however, he was not questioned about

this case until after Bobby Williams had made his statement which the defendant observed on video-tape. While still under the influence of LSD, he agreed to give his video-tape confession after Detective Knight threatened him and repeatedly prepared him as to what to say. He asserted that Detective Knight displayed a cocked revolver and threatened to shoot and kill him for escape. Also, Detective Knight purportedly threatened to have the defendant's wife charged with Murder and held without bond, and said that the defendant would never again see his son who had been placed in a children's shelter. The defendant admitted a conviction, which was on appeal, for First Degree Murder, one month earlier before the same court along with Bobby Williams, and also felony convictions for Second Degree Forgery and Attempted Larceny of a Motor Vehicle.

Detective Adam J. Knight, assigned to the homicide division of the Oklahoma City Police Department, then testified that he also participated in the arrest of the defendant and Bobby Williams on the afternoon of November 2, 1973, and introduced testimony tending to show that the defendant did not inject LSD into his mouth upon being arrested, nor demonstrate the purported symptoms of being under the influence of the same. He explained that he questioned the defendant on only two occasions, first shortly after arrival at the police station and then early the following afternoon, and that the subject offense was not discussed during these interviews. He advised the defendant of his constitutional rights prior to the first interview, including his right to an attorney, but at no time did the defendant request an attorney. He denied the allegations of misconduct attributed to him by the defendant and Bobby Williams, and specifically denied ever threatening the defendant or rehearsing him to make the video-tape confession. Just before the defendant made the video-tape confession, this witness testified that he was present when Detective Guinn in-

terviewed the defendant, and that after observing a video-tape statement made by Bobby Williams, the defendant "started saying how stupid Williams was, calling him a few names, and he then said, well, I am going to have to tell them the whole truth now about everything." [Tr. 340]

Detective Jerry Guinn was then recalled and testified that he only interviewed the defendant at the time of the video-tape confession, and that shortly prior thereto he questioned Bobby Williams who stated that the defendant had admitted particulars of the crime to him. When the defendant was then shown a video-tape of the statement made by Bobby Williams, "he looked at Mr. Williams and he called him a profane name, and he told him, said don't you see what they are doing. Now, I am going to have to tell the truth, and I am going to have to give a statement and clear up the crime." [Tr. 361]. This witness also corroborated the testimony of Detective Knight which tended to establish that the defendant did not inject LSD into his mouth as the arresting officers approached.

The State then rested rebuttal and no evidence in surrebuttal was offered in behalf of the defendant.

■ In his first assignment of error, the defendant contends that the death sentence is unconstitutional by virtue of the decision of the United States Supreme Court in the consolidated cases of *Furman v. Georgia, Jackson v. Georgia* and *Branch v. Texas,* 408 U.S. 238, 92 S.Ct. 2726, 32 L.Ed.2d 346 (1972). However, in this regard we need only observe that this contention was thoroughly analyzed and rejected by this Court in the consolidated opinion of *Williams and Justus v. State,* Okl.Cr., 542 P.2d 554 (1975).

In his final assignment of error the defendant contends that the death penalty cannot be imposed because five veniremen were improperly excused for cause in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

The pertinent voir dire examination of these prospective jurors is set forth in the Appendix hereto. In that decision expressing the views of five Justices, the United States Supreme Court held as follows:

". . . Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. . . ." (391 U.S. 522, 88 S.Ct. 1776, footnote omitted).

■ However, we agree with the position ably adopted by the State on appeal that the applicability of *Witherspoon* is limited to those cases where, upon conviction for the offense charged, the jury has discretion to resolve whether the defendant shall suffer death or some lesser degree of punishment. This conclusion becomes clearly apparent upon an examination of the facts and rationale upon which that decision was based. In pertinent part, the United States Supreme Court there reasoned as follows:

". . . We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. . . .

"It does not follow, however, that the petitioner is entitled to no relief. For in this case the jury was entrusted with two distinct responsibilities: first, to determine whether the petitioner was innocent or guilty; and second, if guilty, to determine whether his sentence should be imprisonment or death. It has not been shown that this jury was biased with respect to the petitioner's guilt. But it is self-evident that, in its role as arbiter of the punishment to be imposed, this jury fell woefully short of that impartiality

to which the petitioner was entitled under the Sixth and Fourteenth Amendments. . . .

" . . . [I]n Illinois, as in other States, the jury is given broad discretion to decide whether or not death *is* 'the proper penalty' in a given case, and a juror's general views about capital punishment play an inevitable role in any such decision.

"A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror. But a jury from which all such men have been excluded cannot perform the task demanded of it. Guided by neither rule nor standard, 'free to select or reject as it [sees] fit,' a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death. . . .

"If the State had excluded only those prospective jurors who stated in advance of trial that they would not even consider returning a verdict of death, it could argue that the resulting jury was simply 'neutral' with respect to penalty. But when it swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle, the State crossed the line of neutrality. In its quest for a jury capable of imposing the death penalty, the State produced a jury uncommonly willing to condemn a man to die. . . . [391 U.S. 517–521, 88 S.Ct. 1770, footnotes omitted]

\*     \*     \*     \*     \*     \*

"It is suggested in a dissenting opinion today that the State of Illinois might 'impose a particular penalty, including death, on all persons convicted of certain crimes.' . . . But Illinois has attempted no such thing. Nor has it defined a category of capital cases in which 'death [is] the *preferred* penalty.'

. . . Instead, it has deliberately 'made . . . the death penalty . . . an optional form of punishment which the jury remains free to select or reject as it sees fit.' . . . And one of the most important functions any jury can perform in making such a selection is to maintain a link between contemporary community values and the penal system . . . " [Footnote 15, 391 U. S. 519, 88 S.Ct. 1775]

In a separate opinion to *Witherspoon,* Justice Douglas singularly adopted an extreme position which emphasized jury selection from a cross-section of the community. In such cases, he was of the opinion that the State should be prohibited from excusing for cause even jurors irreconcilably opposed to the death penalty, and that not only the death sentence, but the verdict of guilt as well should be reversed since prejudice should be presumed from the resulting class exclusion. However, even in expressing this view, Justice Douglas recognized the inapplicability of *Witherspoon* to cases wherein the jury does not retain discretion in the imposition of the death penalty, in stating:

"The Court in *Logan v. United States,* 144 U.S. 263, 298, 12 S.Ct. 617, 628, 36 L.Ed. 429, 441, held that prospective jurors who had conscientious scruples concerning infliction of the death penalty were rightly challenged by the prosecution for cause, stating that such jurors would be prevented 'from standing indifferent between the government and the accused, and from trying the case according to the law and the evidence . . . .'

"But where a State leaves the fixing of the penalty to the jury, or provides for a lesser penalty on recommendation of mercy by the jury, or gives the jury power to find guilt in a lesser degree, the law leaves the jury great leeway. Those with scruples against capital punishment can try the case 'according to the law and the evidence,' because the law does not contain the inexorable command

of 'an eye for an eye.' Rather 'the law' leaves the degree of punishment to the jury. *Logan v. United States* in the setting of the present case does not state what I believe is the proper rule. Whether in other circumstances it states a defensible rule is a question we need not reach. Where the jury has the discretion to impose the death penalty or not to impose it, the Logan rule is, in my opinion, an improper one. For it results in weeding out those members of the community most likely to recommend mercy and to leave in those most likely not to recommend mercy." [391 U.S. 528–529, 88 S.Ct. 1781, footnotes omitted]

The capital punishment provisions under which the defendant here was convicted, 21 O.S.Supp.1974, § 701.1 et seq. were enacted by the Oklahoma Legislature in response to *Furman*, supra, and making the assessment of the death penalty mandatory upon conviction for First Degree Murder, represent the extreme approach necessary to curb the unfettered sentencing discretion condemned in that case. See *Williams*, supra. In this regard, § 701.3 provides, in pertinent part:

"Every person convicted of murder in the first degree shall suffer death. In the case of a jury trial, the jury shall determine only whether the defendant is guilty or not guilty of murder in the first degree and upon a finding of guilty shall so indicate on their verdict and state affirmatively in their verdict that the defendant shall suffer death. . . ."

■ With respect to the imposition of the death penalty, the "conscience of the community" is thus embodied in the above provision enacted by the duly elected representatives of the people, and in such cases the jury no longer acts as "arbiter of the punishment to be imposed" but is limited to a determination of guilt or innocence, with assessment of the death penalty being mandatory upon conviction. Justice Douglas would apparently extend *Witherspoon*

to cases wherein an instruction upon a lesser included offense was appropriate even though the death penalty was mandatory upon conviction for the principal offense charged. However, no such instruction was given or called for here, and we observe that the view of the majority in that case was concerned with situations wherein the jury was "[g]uided by neither rule nor standard" and within its discretion free to choose between the death penalty or lesser punishment for the offense charged.

■ The inapplicability of *Witherspoon* to the present case, however, does not mean that the exclusion for cause of jurors antagonistic to capital punishment is without standard. In such cases, the appropriate basis for challenge may be for implied bias or actual bias to the extent that the personal scruples or opinions of a venireman will not yield to what the Legislature has determined to be the law.

With respect to implied bias, 22 O.S. 1971, § 660, provides, in pertinent part:

"A challenge for implied bias may be taken for all or any of the following cases, and for no other:

\* \* \* \* \* \*

8. If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty of, in which case he shall neither be permitted nor compelled to serve as a juror."

Regarding challenges for actual bias, 22 O.S.1971, § 659, provides in pertinent part:

"Particular causes of challenge are of two kinds:

\* \* \* \* \* \*

2. For the existence of a state of mind on the part of the juror, in reference to the case, or to either party, which satisfies the court, in the exercise of a sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging, and which is known in this chapter as actual bias."

In *Application of Sharp,* Okl.Cr., 414 P. 2d 720, 722 (1966), this Court stated with regard to challenges for implied bias:

" . . . [W]e have repeatedly held that 22 O.S.1961, § 660 requires a juror's removal for cause if he has conscientious opinions concerning capital punishment that would preclude his finding the defendant guilty. See *Cardwell v. State,* 20 Okl.Cr. 177, 201 P. 817 and *Reed v. State,* 2 Okl.Cr. 589, 103 P. 1042."

■ We have carefully reviewed the voir dire examination in this case, and first observe that the trial court conducted such examination as though *Witherspoon* were applicable, whereas to the extent of the inquiry made, the prosecutor utilized a more appropriate approach, i. e. inquiry for a determination as to whether the veniremen could assess the death penalty were the State to prove the defendant guilty of the offense charged beyond a reasonable doubt. The prosecutor could, however, have appropriately inquired further as to whether the mandatory assessment of such punishment upon conviction would prevent the veniremen from standing indifferent between the State and the defendant in the deliberation of their verdict according to the law and the evidence. The people have, through the Legislature, predetermined that such offenses are proper cases for the exclusive assessment of capital punishment, and the pertinent voir dire inquiry is whether in view thereof, the veniremen can deliberate upon the evidence impartially under the law and assess such punishment should guilt be established beyond a reasonable doubt.

We find that the voir dire examination of the last two veniremen excused upon this basis, Mrs. Oberton and Mr. Hamilton, clearly and unequivocally establish that they could not assess the death penalty even assuming the guilt of the defendant to have been established beyond a reasonable doubt. Although the examination of Mrs. Oberton was relatively limited, she was one of the original twelve veniremen to be called and this conclusion becomes apparent in view of the reference by the trial court to the questions previously propounded. Viewed most favorably to the defendant, the responses of the first three veniremen to be so excused were somewhat equivocal. However, we observe that defense counsel did not object to the exclusion of any of the five subject veniremen, and this would certainly indicate that he did not then consider the defendant to have been prejudiced. Further, the absence of a systematic scheme to exclude all veniremen with hesitation concerning the death penalty and irrespective of their capacity to otherwise sit as fair and impartial jurors, is evidenced by the following examination conducted by the prosecutor of Mrs. Horn, who was one of the jurors finally empanelled to try this case:

"MR. HARRIS: Mrs. Horne, you have heard all of the questions asked here, and, could you render a verdict, knowing that it would be a death penalty?

MRS. HORNE: I hate to say this, but I don't know whether I could do it or not. I really don't.

MR. HARRIS: Could you except [sic] the . . .

MRS. HORNE: ˙ . . . the evidence?

MR. HARRIS: The instructions of the Court?

MRS. HORNE: Yes.

MR. HARRIS: And the evidence from the witness stand and decide this case on those things, and those alone?

MRS. HORNE: Uh, huh.

MR. HARRIS: And, if it proved him guilty, beyond a reasonable doubt, as charged, and that meant the death penalty, could you render a verdict for that?

MRS. HORNE: Well, I would do my best.

MR. HARRIS: You would try, wouldn't you?

MRS. HORNE: I would try." [Tr. 29–30]

We are of the opinion that a challenge for cause is appropriate to the extent that the venireman is equivocal and uncertain regarding his capacity to follow the law and honor the oath of a juror. Under even the requirements of *Witherspoon,* this Court has previously approved challenges for cause where otherwise appropriate and based upon responses of a no more equivocal nature than existed here. See *Koonce v. State,* Okl.Cr., 456 P.2d 549 (1969), death sentence modified to life imprisonment pursuant to *Furman,* supra, 408 U.S. 934, 92 S.Ct. 2845, 33 L.Ed.2d 748 (1972); *Koonce v. State,* Okl.Cr., 502 P.2d 1048 (1972), and *Gibson v. State,* Okl.Cr., 501 P.2d 891 (1972). Clearly, no prospective juror with animosity concerning the death penalty should be excused upon this basis if able to set aside personal beliefs or attitudes and fulfill the oath to try the case impartially according to the law and the evidence. However, if satisfied of the defendant's guilt beyond a reasonable doubt, a venireman is unresolved as to whether he could then assess the death penalty, or knowing the death penalty to be mandatory upon conviction, he is uncertain whether he could stand indifferent between the defendant and the State in deliberating his verdict according to the law and the evidence, then he has to that extent forewarned the court that he is undecided whether he could comply with the oath of a juror. A challenge for cause should be granted against such a venireman, for otherwise the administration of the oath would be frivolous. We agree with the cogent argument of the State that the trial court should not accept a juror who does not know whether he can follow the law, and that to do otherwise would create chaos and make our system of jurisprudence a mockery based upon the personal whims of individuals. The State, as well as the defendant, is entitled to a fair and impartial jury. See *Payne v. State,* Okl. Cr., 276 P.2d 784 (1954) and *Hayes v. Missouri,* 120 U.S. 68, 7 S.Ct. 350, 30 L.Ed. 578 (1887). In holding this proposition to be without merit, we adopt the following language from *Logan,* supra, also approved by three Justices in a dissenting opinion to *Witherspoon:*

". . . A juror who has conscientious scruples on any subject, which prevent him from standing indifferent between the government and the accused, and from trying the case according to the law and the evidence, is not an impartial juror . . ." [144 U.S. 299, 12 S.Ct. 628]

The evidentiary hearing contemplated under the provisions of 21 O.S.Supp.1974, §§ 701.5 and 701.6 was previously assigned and heard by this Court. No evidence was offered by either the defendant or the State upon that hearing. Rather, shortly prior thereto the defendant filed a motion requesting that this Court establish guidelines for the review of death sentences under those statutory provisions, and each party hereto candidly indicated that without such guidelines these statutes were so vague and uncertain that they were unaware as to how to proceed. As we have by our decision in *Williams and Justus v. State,* supra, held these provisions to be unconstitutional, no further discussion thereof is necessary here.

Pursuant to Rule 1.11 of this Court, 22 O.S.Supp.1974, Ch. 18, App., this case was previously assigned and heard for oral argument. We have now carefully reviewed the entire record before this Court, and thoroughly considered the argument and authority presented, and have determined that the record is free of any error of law requiring reversal. The judgment and sentence is accordingly *Affirmed.*

Pursuant to Rule 1.18, 22 O.S.Supp.1974, Ch. 18, App., the defendant is advised that any Petition for Rehearing herein must be filed with the Clerk of this Court within fifteen (15) days of the date upon which this opinion is filed therein.

BRETT, P. J., and BLISS, J., concur.

See Appendix on next page.

## APPENDIX

*Selected Voir Dire Examination*

"MR. HARRIS: Now, if we prove him guilty, beyond a reasonable doubt, as charged, the law says that you are to assess the death penalty, no other penalty.

Is there any of you, for any reason, who could not follow that law?

Mrs. Johnson?

MRS. JOHNSON: Uh, no.

MR. HARRIS: You don't think you could follow that law?

MRS. JOHNSON: No, I don't.

MR. HARRIS: No matter what the facts are or the Court's instructions might be?

MRS. JOHNSON: I have known someone, and I don't think I could.

MR. HARRIS: You can't do that.

We will challenge the Juror for Cause.

THE COURT: Let me ask you this question, Mrs. Johnson, are your reservations about the death penalty such that regardless of the law and the facts and the circumstances of the case you could not inflict a death penalty, if you found beyond a reasonable doubt that the—the defendant to be guilty of the charge of Murder in the First Degree?

MRS. JOHNSON: Do I have to talk about, please. I mean - - -

THE COURT: (Interposing) I would prefer that you not, really.

How would you answer the question?

MRS. JOHNSON: I don't think I could. I don't think I could.

THE COURT: All, right, I am going to excuse you.

I think you would have enough problems in that area that it wouldn't be fair to anybody." [Tr. 17 & 18]

     \*     \*     \*     \*     \*     \*

"MR. HARRIS: Now general - - - a few more general questions to all of you.

You will require that the Defendant— that we, the State, prove the Defendant guilty beyond a reasonable dout [sic] as charged, and he is charged with committing murder while engaged in an armed robbery.

Now, if we prove those facts, then you have only one - - - to your satisfaction, you have only one choice, and that's to find him guilty and assess the death penalty, either that or nothing.

Does that bother any of you?

Mrs. Cox, . . .

MRS. COX: Yes, sir, it does.

MR. HARRIS: What is it?

MRS. COX: Yes, sir, it does. I am just not really sure.

I think we should not have the death penalty. I don't know. I am really unsure about that.

It is just . . .

MR. HARRIS: You listen - - - could you listen to the evidence?

MRS. COX: Yes, sir, I could listen to the evidence.

MR. HARRIS: And instructions of the Court?

MRS. COX: Yes, sir.

MR. HARRIS: And follow the law with reference to it.

MRS. COX: Yes, sir.

MR. HARRIS: And, if the State proves, beyond a reasonable doubt he was guilty?

MRS. COX: Yes, sir.

MR. HARRIS: Could you assess the death penalty?

MRS. COX: I just don't know. I - - - I am afraid it would bother me later on. I just don't know, really. I mean, . . .

MR. HARRIS: You have some reservations about that, don't you?

MRS. COX: Yes, sir.

MR. HARRIS: We ask the Juror be excused for cause.

THE COURT: Just a minute. I need to ask you a question, Mrs. Cox.

Are your reservations about the death penalty such that regardless of the law, the facts, and the circumstances of the case, you could not inflict the death penalty if you found beyond a reasonable doubt that the Defendant was guilty of the crime of Murder in the First Degree?

MRS. COX: That is why I would really like to be excused.

I think _ _ _ I feel like I have to do it if I felt like, you know, it was proved to me, and I just _ _ _ I'm just _ _ _ I just don't know.

THE COURT: All, right, I am going to excuse you.

(WHEREUPON, Mrs. Juanita R. Cox was excused.)

MRS. BREWER [sic. MRS. BOWERS]: I would like to be excused for the same reason, because I am nervous and I am afraid, . . .

THE COURT: Let me get back to you in a moment if you will.

MRS. BREWER [sic MRS. BOWERS]: I have had a heart attack a few years ago, and I am afraid it might make me nervous.

THE COURT: I will be back in a minute. We need to fill the other seat here, and we will come back to you if you don't mind." [Tr. 20–22]

\*     \*     \*     \*     \*     \*

"MR. HARRIS: Mrs. Bowers, I believe your name is?

MRS. BOWERS: Yes.

MR. HARRIS: You say that you don't know whether you could sit or not?

MRS. BOWERS: I sure don't think I can.

MR. HARRIS: I might suggest to you that the Jury may be sequestered here. That means you will be kept together over night, and so forth. Does that bother you?

MRS. BOWERS: Well, it might. Like I say, I have   . . .

THE REPORTER: I am sorry, I can't hear you.

MRS. BOWERS: This case would make me nervous, I believe, if I had to stay, you know.

MR. HARRIS: You don't believe that you could sit as a fair and impartial juror and render a verdict of guilty knowing that it might be the death penalty?

MRS. BOWERS: I don't believe I could.

MR. HARRIS: You are afraid you couldn't?

MRS. BOWERS: Couldn't.

MR. HARRIS: We challenge the Juror for cause.

THE COURT: Mrs. Bowers, let me ask you this question which I have asked previously of the other Jurors.

Are your reservations about the death penalty such, regardless of the law, the facts and the circumstances of the case, you could not inflict the death penalty, if you found beyond a reasonable doubt the defendant was guilty of the crime of Murder in the First Degree?

MRS. BOWERS: I don't believe I could. It would make me nervous worrying about it, thinking about it, I am sure it would.

THE COURT: I am going to excuse Mrs. Bowers." [Tr. 24 & 25]

\*     \*     \*     \*     \*     \*

"THE COURT: . . . Now, there is nothing particularly easy about being a Juror, as you may have discovered by now, and I don't anticipate that this case will be either.

Mrs. Oberton, what is your situation?

MRS. OBERTON: Concerning the death penalty.

THE COURT: All, right. Let me ask the same question that I have asked before.

Did I understand that you were a Minister?

"MRS. OBERTON: Yes.

THE COURT: Is there some part of your religious creed or tenants that you have this religious scruples or principles that would be involved in this?

MRS. OBERTON: Yes.

THE COURT: You don't feel that you would be able to sit as a Juror in the case where the death penalty is the punishment.

MRS. OBERTON: No.

THE COURT: I am going to excuse you then . . ." [Tr. 26 & 27]

\* \* \* \* \* \*

"MR. HARRIS: The Laws of Oklahoma require that Murder I requires the death penalty.

If the State proves, beyond a reasonable doubt that the Defendant was guilty as charged, could you vote the death penalty?

MR. HAMILTON: No.

MR. HARRIS: We challenge the Juror for Cause.

THE COURT: Mr. Hamilton, you may step down if you would, please." [Tr. 76 & 77]

### ORDER ON REHEARING

Appellant was heretofore sentenced to suffer death for the offense of First Degree Murder in Case No. CRF–73–3180 of the District Court, Oklahoma County, and upon appeal that sentence was thereafter affirmed in the above entitled cause. This Court then stayed the issuance of Mandate herein, upon its own motion, pending a resolution of related issues raised in the Petition for Rehearing in *Williams and Justus v. State*, Okl.Cr., 542 P.2d 554, (1975), and oral argument was thereafter presented upon consolidated hearing. For the reasons discussed in our Opinion on Rehearing in *Williams and Justus*, the decision previously rendered herein is hereby *reaffirmed*.

It is therefore ordered, adjudged and decreed that the Order of this Court staying execution of sentence herein pending appeal be dissolved, and the Order of this Court staying issuance of Mandate is hereby superseded, and the Clerk of this Court is directed to issue Mandate *forthwith*.

It is further ordered, adjudged and decreed that the judgment and sentence herein appealed from be carried out by the electrocution of Appellant, Allen Clayburn Justus, by the Warden of the State Penitentiary at McAlester, Oklahoma, on Monday, February 23, 1976.

TOM BRETT, P. J.
HEZ J. BUSSEY, J.
C. F. BLISS, Jr., J.