**William David HOVILA, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 49396.

Court of Criminal Appeals of Texas.

April 30, 1975.

On Denial of Rehearing Feb. 11, 1976.

Howard G. Wilson, Dallas, Timothy Ann Sloan, Odessa, for appellant.

Henry Wade, Dist. Atty., and W. T. Westmoreland, Jr., Robert E. Whaley, Steven Tokoly and John Ovard, Asst. Dist. Attys., Dallas, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

MORRISON, Judge.

The offense is murder; the punishment, under Article 1257, Vernon's Ann.P.C.[1] and Article 37.071, Vernon's Ann.C.C.P.[2], death.

We are met at the outset with appellant's contention that "the trial court failed to properly apply the standards of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)."

*Witherspoon* held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."

The Supreme Court reiterated its position in *Boulden v. Holman*, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969), and again shortly thereafter in *Maxwell v. Bishop*, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970), by quoting *Witherspoon* :

> " 'Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial may reveal, it simply cannot be assumed that that is his position.' "

In *Grider v. State*, Tex.Cr.App., 468 S.W.2d 393, this Court applied the doctrine set out in *Witherspoon*, stating:

> "It is clear then that the procedure utilized in the case at bar in excusing prospective jurors after an initial expression of 'conscientious scruples' or disclaimer of belief in capital punishment without going further and ascertaining that the prospective juror would automatically vote against the death penalty in any case,

regardless of the facts, or consider its imposition in the case irrespective of the evidence, etc., does not square with *Witherspoon* or the traditional Texas practice."

See also *Ex parte Martin*, Tex.Cr.App., 479 S.W.2d 280; *Ocker v. State*, Tex.Cr. App., 477 S.W.2d 288. Cf. *Tezeno v. State*, Tex.Cr.App., 484 S.W.2d 374.

■ Initially we must determine if the test set forth in *Witherspoon* applies in view of the oath[3] now required of jurors in death penalty cases and under the new procedure set forth in Article 37.071, supra, for determination of punishment in a death penalty case. See also Article 1257, supra, and Section 19.03, V.T.C.A., Penal Code.

While the new statutes provide that the jury shall take an oath that they will not let the penalty involved affect their deliberations and requires them only to answer questions while the judge actually assesses the punishment based on such answers, the fact remains that the jury will know that their answers will determine whether the defendant is to be punished by death or by life imprisonment. To say that the jury's answers would not be affected by their attitude toward the death penalty as a punishment for crime simply because they will not bring forth the ultimate verdict would be to disregard the obvious. We will not engage in such tenuous reasoning.

We hold, therefore, that the *Witherspoon* test remains the same.

We must next determine whether the requisites of *Witherspoon* have been met in the case at bar. At the outset of the voir dire of each jury panel, the trial court instructed them on the general principles of

1. As amended, Acts 1973, 63rd Leg., p. 1122, ch. 426, Article 1, Sec. 1, eff. June 14, 1973. Article 1257 was superseded by Section 19.-03 of the new Texas Penal Code, Acts 1973, 63rd Leg., ch. 399, eff. January 1, 1974. Section 19.03 of the new Penal Code is substantially similar to Article 1257 of the old code. The indictment alleged the date of the offense as June 27, 1973.

2. Added by Acts 1973, 63rd Leg. p. 1125, ch. 426, Art. 3, Sec. 1, eff. June 14, 1973.

3. Article 1257(d), V.A.P.C. states in part: ". . . . No person is qualified to serve as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

criminal law as well as on the new death penalty statute and the jury's role in administering it. He then asked those who felt that they were disqualified for any reason to come forward and present their excuses. Among those who expressed reservations as to their ability to impose the death penalty were:

1. Mrs. T. W. Smith:

"Q  May I have your name?

A  Mrs. T. W. Smith.

MR. WHALEY [The prosecutor]: No. 2, Judge.

Q  All right.

A  I can't—I don't believe in the death penalty. I feel like I'm disqualified. I don't think I could sit on it.

THE COURT: Any questions, gentlemen?

MR. WHALEY: No, sir.

MR. WILSON [Defense Attorney]: No.

THE COURT: You may be excused."

2. J. R. Chatham:

"Q  What is your name?

A  Chatham. With a clear conscience I could not make a decision of that magnitude.

MR. WHALEY: No. 21.

THE COURT: Mr. Chatham, you may be excused."

3. Dorothy Guttridge:

"THE COURT: Will you state your name, please?

A  Dorothy J. Guttridge.

MR. TOKOLY: 29, Your Honor.

THE COURT: All right.

MRS. DOROTHY J. GUTTRIDGE: I just don't feel like I can live with myself knowing that I might have adjudged death on somebody.

THE COURT: And you couldn't answer the issues without concerning yourself about the effect of your answers? Is that what you are telling the Court?

A  Right.

MR. SIMMONS [Defense Attorney]: I have no questions.

THE COURT: Thank you. You may be excused."

4. Juanita Miller:

"Q  What is your name?

A  Juanita Miller.

MR. WHALEY: No. 6.

THE COURT: Yes, ma'am?

A  I'm afraid my conscience wouldn't let me give the death sentence.

Q  You couldn't answer the questions without concerning yourself about the death penalty?

A  No, I couldn't.

THE COURT: You may be excused."

5. Mrs. L. N. D. Wells, Jr.:

"Q  Your name, please?

A  Mrs. Wells.

MR. WHALEY: No. 3, Judge.

THE COURT: All right, Mrs. Wells.

A  I am unalterably opposed to the death penalty.

Q  To such an extent—

A  I hate to say it, but it really is true.

Q  Don't hate to say it. Thank you for your courtesy in coming up.

If there is any objection to this please let me know.

(Whereupon, Prospective Juror No. 3, Second Panel, Mrs. L. N. D. Wells, Jr., was excused.)"

■ The cursory examination of these members of the venire was insufficient to meet the test promulgated by the United States Supreme Court in *Witherspoon*, and applied by this Court in *Grider*; and this conviction can therefore not stand.

Accordingly, the judgment is reversed and the cause remanded.

ROBERTS, J., concurs in the results for the reasons stated in his dissent in *Jurek v. State*, 522 S.W.2d 934 (1975).

ODOM, Judge (dissenting).

The majority have ordered this needless reversal on inadequate reasoning. They have misinterpreted Article 37.071, V.A.C. C.P., and have incorrectly determined the applicability of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

*Witherspoon*, supra, says:

"Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."

The procedure set out in Article 37.071, supra, is mechanical, and provides for a mandatory death penalty upon an affirmative answer to each of the special fact issues submitted under Section (b). The jury neither imposes nor recommends imposition of the death penalty under this statute. In fact, under the provisions of Article 1257, V.A.P.C. (under which appellant was convicted), each juror must state under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact. The majority ignore both the mandatory character of this statute and the oath required of each juror. I must dissent to their reliance upon a presumption of jury misconduct.

I also dissent to the majority's reversal of this conviction because the reasoning followed in their opinion is in conflict with that followed in their disposition of *Jurek v. State*, 522 S.W.2d 934 (1975). In *Jurek* the majority found that Article 37.071, supra, provides for a limitation on "the standardless imposition of the death penalty," by "channel[ing] the jury's consideration on punishment," and "direct[ing] and guid[ing] their deliberations." These controls, said the majority, saved this statute from the faults condemned in *Furman v. Georgia* and *Branch v. Texas*, 408 U.S. 238, 92 S.Ct. 2726, 32 L.Ed.2d 346. Now, say the majority,

"the fact remains that the jury will know that their answers will determine whether the defendant is to be punished by death or by life imprisonment. To say that the jury's answers would not be affected by their attitude toward the death penalty . . . would be to disregard the obvious." After their finding that the controls of Article 37.071 save the scheme from unconstitutionality, they now find it obvious that the controls will be ignored. If the majority insist on being wrong, they should at least strive to be wrong with consistency, and avoid being wrong in a different way each day.

Finally, I must dissent for the reasons stated in my opinion concurring in part and dissenting in part in *Jurek v. State*, supra. In that opinion I pointed out the defects in Article 37.071, supra, which render it unconstitutional. Under the reasoning therein the judgment herein should likewise be reformed to provide for life imprisonment. The *Witherspoon* issue upon which the majority stand so ready to reverse would then be moot (*Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797; *Stephenson v. State*, Tex.Cr.App., 494 S.W.2d 900, 910) and the judgment would be affirmed.

For all the reasons stated I dissent to the needless reversal of this case.

## STATE'S MOTION FOR REHEARING

ONION, Presiding Judge (concurring).

While I concur in the action of the majority in overruling the State's motion for rehearing without written opinion, I have concluded that in order to clarify some confusion which exists among the bench and bar as to when a sentence should be pronounced in a death penalty case appellant's first ground of error on original submission should be discussed.

In his first ground of error appellant contends the appeal should be abated because the trial court improperly pronounced sentence prior to the decision of this court

in violation of Article 42.04, Vernon's Ann. C.C.P., which provides in part:

"When an appeal is taken from a death penalty, sentence shall not be pronounced, but shall be suspended until the decision of the Court of Criminal Appeals has been received. . . ."

Article 42.02, Vernon's Ann.C.C.P., provides:

"A 'sentence' is the order of the court in a felony or misdemeanor case made in the presence of the defendant, except in misdemeanor cases where the maximum possible punishment is by fine only, and entered of record, pronouncing the judgment, and ordering the same to be carried into execution in the manner prescribed by law."

Article 43.14, Vernon's Ann.C.C.P., provides that when a sentence of death is pronounced the sentence shall be executed "at any time before the hour of sunrise on the day set for the execution not less than thirty days from the day of sentence, as the court may adjudge . . . ."

Article 43.15, Vernon's Ann.C.C.P., describes the duties of the clerk of the trial court in issuing a warrant for the execution of the sentence of death within ten days of such sentence, which shall recite, among other things, "the time fixed for his execution," set by the trial court.

In view of the time limits set forth in these latter statutes, it is understandable why sentence is delayed in death cases until the receipt of the mandate of the Court of Criminal Appeals as required by Article 42.-04, supra. See and compare time limits for preparation of an appellate record, Article 40.09, Vernon's Ann.C.C.P.

Article 37.071(e) provides that if the jury returns an affirmative finding on each issue submitted under the statute "the court shall sentence the defendant to death. . . ." and Section (f), which provides in part that the "judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals . . . ."

A study of Article 37.071, supra, reveals that the drafting of such statute started with out-of-state statutes where the words "sentence" or "sentencing" were not used in the same sense as a formal sentence defined in Article 42.02, supra, but were used as equivalent to punishment.

I therefore would hold that the provisions of Article 37.071, supra, referring to "sentence to death," etc., refers to the assessment of punishment and not to a formal sentence, and the provisions of Article 42.-04, supra, still control. The trial judge was apparently misled by the awkward wording of Article 37.071, supra, but it is observed that no execution date was set as normally required in death sentences, apparently because the court realized that it could not be carried out within the necessary time limits while the case was on appeal, and that another sentence setting the execution date would be required.

There is no reason to abate the appeal because the court pronounced sentence. It will be regarded as surplusage. Appellant's contention is without merit.

DOUGLAS, Judge (dissenting).

The majority has overruled the State's motion for rehearing without written opinion.

After further consideration, it appears that reversible error was not committed during the examination of the prospective jurors. It appears that *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, was complied with.

In my opinion jurors can qualify under *Witherspoon*, supra, and can take the oath under Article 1257(d), V.A.P.C., now Section 19.03, V.T.C.A. Penal Code (1974), which provides, in part:

"No person is qualified to serve as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

It appears that one may take such an oath and abide by it regardless of his personal opinion regarding a life or death sentence. A juror whose determination of any issue of fact would be affected, in either direction, by a mandatory punishment of life or death cannot be a fair and impartial juror.[1]

Without going into detail about the jury selection, the jurors were not discharged as condemned in *Witherspoon* because they simply voiced general objections to the death penalty or expressed conscientious scruples against its infliction.

Both sides agreed that each prospective juror found by the court to be disqualified because of the inability to take the prescribed oath under Article 37.071, V.A.C.C.P., was in fact and in law disqualified.

This is not a case where there is a contention that challenges for cause were exercised by the State merely because the prospective jurors had conscientious scruples against the penalty that might be assessed.

It appears that the original opinion holds that the only way a juror could be challenged for cause by the State would be by establishing that he would automatically vote against the imposition of the death penalty in any cause. This application of *Witherspoon* is incorrect.

First of all, it is apparent that the United States Supreme Court, at the time it decided *Witherspoon*, was well aware of the fact that some state statutes impose a mandatory death penalty for certain types of crimes and that a jury could avoid such a penalty by finding the defendant guilty of a lesser offense. This assumption is certainly strengthened by the concurring opinion of Mr. Justice Douglas wherein he said:

"The problem is presented in different postures under several types of state laws. Many States, including Illinois, specifically grant the jury discretion as to penalty; in some, this discretion is exercised at a special penalty trial, convened after a verdict of guilt has been returned. In other States, death is imposed upon a conviction of first degree murder unless the jury recommends mercy or life imprisonment, although in these States the jury is allowed to find a lesser degree of murder (or to find manslaughter, if under state law there are no degrees of murder), if the evidence will permit, without regard to the formal charge. In some States, the death penalty is mandatory for certain types of crimes. In still others, it has been abolished either in whole or in part. And a few States have special rules which do not fit precisely into the above categories. . . .

". . . The conscience of the community is subject to many variables, one of which is the attitude toward the death sentence. If a particular community were overwhelmingly opposed to capital punishment, it would not be able to exercise a discretion to impose or not impose the death sentence. A jury representing the conscience of that community would do one of several things depending on the type of state law governing it: *it would avoid the death penalty by recommending mercy or it would avoid it by finding guilt of a lesser offense.*" [88 S.Ct. 1779, 1780, emphasis added]

Therefore, it is not mere speculation that the proposition was before the Court and recognized by the Court that a jury could avoid determination of the issue of punishment, knowing the result of its answers, by finding the defendant guilty of a lesser offense. This is even more strongly emphasized by what was said in the opinion of the Court by Mr. Justice Stewart when he pointed out that

"[t]he issue before us is a narrow one. It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reser-

---

1. The Court of Criminal Appeals of Oklahoma held that veniremen whose scruples against capital punishment would interfere with their fact finding function may be excluded from the jury. *Justus v. State*, Okl. Cr., 542 P.2d 598, 18 Cr.L. 2042.

vations about capital punishment would *prevent them from making an impartial decision as to the defendant's guilt.*" [88 S.Ct. 1772, emphasis added]

This proposition is even more forcefully illustrated by what the Court pointed out in footnote 21 to the majority opinion where it said

"We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that *their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.*" [emphasis added]

The primary holding of *Witherspoon* was aimed at qualification of jurors for discretionary determination of punishment, as opposed to a finding of fact. The Court pointed out that

"[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus *obey the oath he takes as a juror.*" [88 S.Ct. 1775, emphasis added]

This interpretation is strengthened by what the Court said in *Boulden v. Holman*, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433, where the Court pointed out:

". . . it is entirely possible that a person who has 'a fixed opinion against' or who does not 'believe in' capital punishment might nevertheless be perfectly able as a juror to abide by existing law— *to follow conscientiously the instructions of a trial judge* and to consider fairly the imposition of the death sentence in a particular case." [89 S.Ct. 1141 and 1142, emphasis added]

Therefore, the main thrust of the decision in *Witherspoon*, as followed in *Boulden v. Holman*, was aimed at preventing the challenge for cause of a juror merely because he was opposed to the death penalty where the jury was to exercise discretion in assessing punishment, but the *Witherspoon* decision made it perfectly clear that it did not apply to a situation wherein, even though the jury was aware of the punishment, they would exercise their discretion by finding the defendant guilty of some other offense. Even though *Witherspoon* speaks of bias in the determination of guilt, they are referring no more to a determination of a fact issue than the instant case.

Under our statutory scheme as expressed in Article 1257(d), V.A.P.C., and the present Article 37.071, V.A.C.C.P., the jury does not assess the death penalty. The jury is charged with the determination of issues of fact under the court's charge and by reason of the statutory scheme they must be able to state under oath that they will not let the consideration of punishment affect their determination of any issue of fact. If they cannot state that they will be unbiased on the determination of issues of fact by reason of possible punishment, then they do not qualify as jurors. It would appear that this is no different from any other basis for disqualification when a juror admits that he cannot be fair and impartial for both sides. It should be remembered that the statute is aimed not merely at conferring a challenge for cause upon the State but also upon conferring a challenge for cause upon the accused if the juror is biased in favor of the death penalty to such an extent that it would affect his impartiality upon the issue of guilt. Although it is thought by some that this might be remote, the possibility was certainly recognized by Mr. Justice Black in his dissent in *Witherspoon*, supra. In that dissent it was pointed out that those in the majority were unwilling to cast any doubt on petitioner's conviction. He went on to point out that the State should be allowed to challenge for cause a juror who was biased against inflicting the death pen-

alty just as the defendant was entitled to a challenge for cause where the prospective juror was biased in favor of the death penalty; for an example, one who adheres literally to the biblical admonition of "an eye for an eye."

In reading the *Witherspoon* opinion in its overall impact, the majority opinion was aimed at challenges for cause where the jury exercised discretion in assessment of penalty and specifically excluded a challenge for cause excluding a juror who admitted his bias one way or the other which would prevent him from making an impartial decision as to an issue of fact. Although this is a fine line to draw, it appears that the United States Supreme Court was aware of the line and drew it in *Witherspoon*. The application to the instant case of what was said in the entire *Witherspoon* opinion leads to the conclusion that under our statutory scheme a juror who cannot state under oath that he will be unbiased on the issue of fact will be disqualified, and such disqualification is not prohibited by the proper application of *Witherspoon v. Illinois*, supra, merely because the juror might realize the effect of his answers to the factual questions.

A part of the State's motion for rehearing, prepared by W. T. Westmoreland, Jr., Assistant District Attorney of Dallas County, is adopted as a part of this opinion to show the procedure used and for its reasoning. It is as follows:

"It has been said that the atmosphere of the proceeding must be considered in resolving a *Witherspoon* question. . . .

"Appellant filed a motion entitled, 'Defendant's Third Motion in Limine'. In paragraph 1 thereof he requested the Court to instruct the prosecutors not to inquire into any prospective juror's personal feelings or scruples regarding the death penalty because such is not allowed by Art. 1257, P.C. In paragraph 2 he requested that the prosecutor be forbidden to bring to the attention of any prospective juror that the penalty of death may be imposed except:

(a) to inform the veniremen that the penalty of life or death is mandatory upon conviction of the offense charged and (b) to ask whether such mandatory penalties will affect his deliberations on any issue of fact. The reason assigned by Appellant was that such questions are the only questions necessary to qualify a juror for such service.

"A hearing was held on the motion prior to the voir dire of the jury, at which the following colloquy occurred:

"'MR. TOKOLY (Prosecutor): We object to the first part of the Motion, Your Honor, on the grounds that I think the *Witherspoon* case entitled us to ask a prospective juror whether or not that juror has any conscientious scruples that would go against the imposition of the death penalty.

"'THE COURT: I think that, though, under this—that a juror who is unalterably opposed to any sentence with (sic) would inflict death as a means of punishment, if they said that they would just absolutely under no circumstances would they want to sit as a juror in a case where the death penalty could be assessed, I think that the juror would be disqualified under the *Witherspoon* case.

"'MR. TOKOLY: Certainly.

"'THE COURT: The *Witherspoon* case said you have got to go on more than just scruples, you have to go further. I'm just talking about if the juror said it's life or death, depending on your answer to the issues.

"'MR. WILSON: (Defense Counsel): I was—

"'THE COURT: And do not consider the results of your answers now, and when they said, "Well, I just wouldn't have anything to do with death, I am just unalterably opposed to sitting in a case where I'm blindfolded and you are going to pull one of these switches, one is life and one is death", I believe that juror should be disqualified.

" 'MR. WILSON: I would agree with that, because I don't think he could consider the facts, put the death sentence out of his mind and make a judgment in answering these questions, if he can. (underscoring supplied)

" 'MR. TOKOLY: I think we are in agreement, Your Honor. The position that the State would take is that, first of all, that question as to whether or not they have any conscientious scruples against the imposition of the death penalty, that is not a disqualification question. It is simply a relevant question that aids the parties on both sides in determining that juror's feelings, and I think that the question would then be whether or not their feelings would affect their deliberations.

" 'THE COURT: I think that question is pertinent.'

"This is what the position of the parties was and the context in which the voir dire was conducted. Counsel and the Court were operating under the consensus that questions regarding scruples were relevant as an aid to peremptory challenges; otherwise, the question was whether any such scruples would affect his deliberation on any question of fact. That is to say, mere conscientious scruples against death might lead to the exercise of a peremptory challenge on the part of the State, absolute inability to vote in a matter which the juror felt would result in the imposition of the death penalty might lead to a challenge for cause by the State, and inability to take the oath that the mandatory penalty of death or life would not affect his deliberations on any issue of fact simply disqualified him from service without challenge by either side, because he would not be fair and impartial, as a matter of law. The Legislature has authority to prescribe the qualifications of jurors in general (e. g. Art. 2133, R.C.S.) and in particular cases (e. g. Art. 2134, R.C.S.) and to prescribe the circumstances in which otherwise qualified citizens can be excused from jury service (Art. 2135, R.C.S.).

"The procedure followed in this case was as follows. When each new section of the jury panel was called to the courtroom, the Court explained the law of the case to them, including the fact that to qualify for service the prospective juror must take the oath. He then invited any prospective juror who thought he might be disqualified for any reason to approach the bench, out of the hearing of others. Some of the jurors were excused for other reasons, but the ones here pertinent were first voir dired by the Court with regard to their position on the required oath. Then each side was permitted to question the prospective juror. Sometimes they did and sometimes they did not. When the Court ruled that the juror was not qualified, each side was accorded the right to object. Although the invitation to question or object was not repeated as to every juror, it was nonetheless understood by all.

"This, then, was the 'atmosphere' of the proceeding. We have here a case wherein the defendant initially wanted the prospective jurors questioned only as to their ability to take the prescribed oath, where he was given the opportunity to examine the veniremen himself on that very subject, where he was given the opportunity to object to a determination of disqualification but did not do so, and where each side had peremptory challenges left after the jury had been selected. . . .

"Furthermore, clearly implicit in the record, based on the position of counsel for both sides throughout the jury selection process, is the fact that each agreed that the prospective jurors found by the Court to be disqualified because of inability to take the prescribed oath were in fact and law disqualified and prohibited from sitting in this case. Query: Is Art. 35.05, C.C.P., providing that 'One summoned upon a special venire may by consent of the parties be excused from attendance by the court at any time before he is impaneled' not for application here? Of course, this was not a special venire, but it was a capital case and

there is no reason in law or logic why the same principle should not apply."

For the above reasons, I would grant the State's motion for rehearing and would affirm the judgment, because the contention that the jury selection does not comply with *Witherspoon* and the other contentions do not reflect reversible error.